ISAAC BRADLIE AND JOHN GIBBONS, PLAINTIFFS IN ERROR v. THE
MARYLAND INSURANCE COMPANY.

Insurance. By the well settled principles of law, in the United States, the state of
the facts, and not the state of the information at the time of the abandonment,
constitutes the criterion by which is to be ascertained whether a total loss has oc-
curred or not, for which an abandonment can be made. If the abandonment when
made is good, the rights of the parties are definitively fixed; and do not become
changed by any subsequent events. If, on the other hand, the abandonment when
made is not good, subsequent circumstances will not affect it, so as retroactively
to impart to it a validity which it had not at its origin.

In cases where the abandonment is founded upon a supposed technical total loss, by
a damage or injury, exceeding one-half of the value of the vessel; although the
fact of such damage or injury must exist at the time; yet it is necessarily open to
proof, to be derived from subsequent events. Thus, if the repairs, when subse-
quently made, clearly exceed the half value, it is plain that this affords one of the
best proofs of the actual damage or injury. On the other hand, if the subsequent
repairs are far below the half value, this, so far as it goes, affords an inference the
other way. In many cases of stranding, the state of the vessel may be such, from
the imminency of the peril, and the apparent cost of expenditures requisite to de-
liver her from it, as to justify an abandonment; although, by some fortunate occur-
rence, she may be delivered from her peril without an actual expenditure of one-
half of her value, after she is in safety. Where, in the circumstances in which
the vessel then may have been, in the highest degree of probability the expendi-
tures to repair her would exceed half her value, and if her distress and peril be
such as would induce a considerate owner, uninsured, and upon the spot, to with-
hold every attempt to get the vessel off, because of such apparently great expen-
ditures; the abandonment would doubtless be good.

In respect to the mode of ascertaining the value of the ship, and, of course, whether
she is injured to the amount of half her value, it has, on the fullest consideration,
been held by this Court; that the true basis of the valuation is the value of the
ship at the time of the disaster; and that if after the damage is, or might be re-
paired, the ship is not, or would not be worth at the place of repairs, double the
cost of repairs, it is to be treated as a technical total loss.

The valuation in the policy, or the value at the home port, or in the general market
of other ports, constitutes no ingredient in ascertaining whether the injury by the
disaster is more than one-half of the value of the vessel, or not. For the like rea-
son, the ordinary deduction in case of a partial loss, of "one-third new for old,"
from the repairs, is equally inapplicable to cases of a technical total loss, by an in-
jury exceeding one-half of the value of the vessel.

The mere retardation of the voyage, by any of the perils insured against, not amount-
ing to, or producing a total incapacity of the ship eventually to perform the voy-
age; cannot, upon principles well established, be admitted to constitute a technical
total loss, which will authorize an abandonment. A retardation for the purpose
of repairing damage from the perils insured against, that damage not exceeding
one moiety of the value of the ship, falls directly within this doctrine. Under

[Bradlie et al. v. The Maryland Insurance Company.]

such circumstances, if the ship can be repaired, and is repaired, and is thus capable of performing the voyage, there is no ground of abandonment founded upon the consideration that the voyage may not be worth pursuing, for the interest of the ship owner; or that the cargo has been injured so that it is not worth transporting further on the voyage: for the loss of the cargo for the voyage, has nothing to do with the insurance upon the ship for the voyage.

An insurance on time, differs, as to this point, in no essential manner from one, upon a particular voyage; except in this, that in the latter case, the insurance is upon a specific voyage described in the policy; whereas a policy on time, insures no specific voyage, but it covers any voyage or voyages whatsoever, undertaken within, and not exceeding, in point of duration, the limited period for which the insurance is made. But it does not contain an undertaking that any particular voyage shall be performed within a particular period. It warrants nothing as to any prolongation or retardation of the voyage; but only that the ship shall be capable of performing the voyage undertaken, notwithstanding any loss or injury which may accrue to her during the time for which she is insured; and of repairing it, if interrupted.

There is no principle of law which makes the underwriters liable in the case of a merely partial loss of the ship, if money is taken up in bottomry for the necessary repairs and expenditures, and which makes it the duty of the underwriters to deliver the ship from the bottomry bond to the extent of their liability for the expenditures; and that if they do not, and if the vessel is sold under the bottomry bond, they are liable, not only for the partial loss, but for all other losses to the owner, for their neglect.

The underwriters engage to pay the amount of the expenditures and losses directly flowing from the perils insured against; but not any remote or contingent losses to the owner, from their neglect to pay the same.

The underwriters are not bound to supply funds in a foreign port, for the repairs of any damage to the ship occasioned by a peril insured against. They undertake, only, to pay the amount, after due notice and proof of the loss, and within a prescribed time.

If, to meet the expenditures for repairs, the master is compelled to take up money on bottomry, and thereby an additional premium becomes payable, that constitutes a part of the loss for which the underwriters are liable. But in cases of partial loss, the money is not taken up on account of the underwriters, but of the owner; and they become liable for the loss, whether the bottomry bond ever becomes due and payable, or not.

In the case of a partial loss, where money is taken up on bottomry bond, to defray the expenditures of repairs, the underwriters have nothing to do with the bottomry bond; but are simply bound to pay the partial loss, including their share of the extra expenses of obtaining the money in that mode, as a part of the loss.

IN error to the circuit court of the United States for the district of Marryland.

The case, as stated in the opinion of the Court, was as follows:

The original action was upon a policy of insurance, dated the 22d of November, 1832, whereby the defendants, the Maryland Insurance Company, caused the plaintiffs, by their agents, (William

Howell & Son,) 'o be insured, lost or not lost, ten thousand dollars, at a premium of four per cent., on the brig Gracchus, Snow, master, (valued at that sum,) at and from Baltimore, for six calendar months, commencing that day at noon; and if she be on a passage at the expiration of the time, the risk to continue, at the same rate of premium, until her arrival at the port of destination. The declaration alleged a total loss by the casting ashore and stranding of the brig, on the 23d of March, 1833, in the river Mississippi. Upon the trial of the cause, it appeared in evidence that the brig sailed from Baltimore on a voyage to New Orleans, and safely arrived there, and took on board part of cargo, (pork and sugar) at that port, on a voyage for Baltimore; and about the middle of the 23d day of March, 1833, sailed from New Orleans, intending to proceed to Sheppard's plantation, on the river Mississippi, about thirty-three miles below New Orleans, to take in the residue of her cargo for the same voyage. At the English Turn, about twenty-two miles from New Orleans, the brig attempted to come to anchor, and in so doing lost the small bower anchor; and then dropped the best bower anchor, which brought her up. The next morning, while the brig was proceeding on her voyage, she struck on a log, broke the rudder pintles, when she fell off and went on shore. A signal was then made for a steamboat in sight, which came to the assistance of the brig, and in attempting to haul her off, the hauser parted. It was then found that the brig was making water very fast; help was obtained from a neighbouring plantation. They commenced pumping and discharging the cargo on board of the steamboat; and after discharging all the pork, and a part of the sugar, they succeeded in freeing the ship on the afternoon of the same day. She was then got off, and proceeded to New Orleans, where she arrived the same night; she continuing to leak, and both pumps being kept going all the time. The next day, the master understood that the steamboat claimed a salvage of fifty per cent., and intended to libel for it. On the 27th of the same month, the brig was taken across the river for repairs. On the same day the brig was libelled for the salvage, in the district court of Louisiana.

On the 25th of March, Snow, the master, wrote a letter to one of the owners, containing an account of the loss and state of the brig; and also of the claim by the salvors of fifty per cent., which the underwriters on the cargo and himself had objected to; adding, that

[Bradlie et al. v. The Maryland Insurance Company.]

they should hold the steamboat liable for any damage that might be incurred on account of the detention.

The following is a copy of the letter.

*New Orleans, 25th March, 1833.*

"Isaac Bradlie, Esq., Seaford, Delaware.

"Dear Sir:—I left here on the 23d inst., to go thirty-six miles below, to complete loading the brig with sugars, for Baltimore; on the evening of the same day in coming to in the English Turn, in a heavy blow from the S. E., parted the small bower cable, and lost the anchor. I then let go the best bower, which brought her up, where we lay during the night; in the morning of the 24th, got under way and proceeded down the river; at 7 A. M., struck on a log, broke the rudder pintles, the brig fell off and went on shore. I then made a signal for a steamboat which was in sight; she came to our assistance and attempted to pull us off, but the hauser parted; we then found that the brig was making water very fast, and that she would soon fill; got thirty odd negroes from a plantation, and commenced pumping, and discharging the cargo on board of the steamboat; after discharging all of the pork and the greater part of the sugar, we succeeded in freeing of her, at 5 P. M.; we then got her off and proceeded up to town, where we arrived at 11 P. M. The owners of the steamboat claim a salvage of fifty per cent. on vessel and cargo, which the underwriters of the cargo, with myself, have objected to: we have not been able to discharge the balance of the cargo to-day; what the consequence will be I cannot say. We hold the owners of the steamboat liable for any damage that may occur on account of the detention; the brig continues to leak so as to keep both pumps going almost constantly. About one-half of the sugar is damaged. I have noted a protest and had a survey, and shall proceed to have every thing done in the most careful manner, as the survey may direct, for the interest of all concerned: as soon as I am able to inform you of what will be done, I will do so by the first opportunity."

On the 22d of April, Messrs. Howell & Son addressed a letter to the company, submitting the letter of the 25th of March to the company; and say therein, " In consequence of the damage, together with the detention that must grow out of a lawsuit, (in which it appears that the vessel is involved,) the voyage being broken up, we

[Bradlie et al. v. The Maryland Insurance Company.]

do hereby abandon to you the brig Gracchus, as insured in your office per policy No. 13,703, and claim for a total loss." On the same day, the company returned an answer, saying, " We cannot accept the abandonment tendered in your letter of this date; but expect, you to do what is necessary in the case for the safety and relief of the vessel."

On the 9th of the ensuing May, the district court decreed one-quarter of the value of the vessel and cargo, (estimated at seven thousand dollars) as salvage; the brig being valued at twenty-five hundred dollars. On the 14th of the same month, the master got possession again of the brig, the salvage having been paid. On the 3d of June, 1833, the brig was repaired and ready for a freight; and early in July she sailed for Baltimore, with a partial cargo on board, on freight; and duly arrived there in the latter part of the same month. The repairs at New Orleans amounted to the sum of one thousand six hundred and ninety dollars and fifteen cents; and the share of the brig, at the general average or salvage, to the sum of one thousand two hundred and forty-five dollars and seven cents; in the whole amounting to two thousand nine hundred and thirty-five dollars and twenty-two cents. To meet this sum, and some other expenses, the master obtained an advance from Messrs. Harrison, Brown & Co., of New Orleans, of three thousand seven hundred and fifteen dollars and forty-one cents, and gave them as security therefor, a bottomry bond on the Gracchus, for the principal sum, and five per cent. maritime premium, payable on the safe arrival of the brig at Baltimore.

On this bottomry bond, the brig was libelled in Baltimore, and no claim being interposed by any person, she was, by a decree of the district court of Maryland, on the 5th of September, 1833, ordered to be sold to satisfy the bottomry bond; and she was accordingly sold by the marshal, about the 20th of the same month, to John B. Howell, for four thousand seven hundred and fifty dollars; who, on the 24th of the same month, paid to the attorney of the libellant the full amount due under the decree of the court. On the same day the president of the company addressed a letter to Messrs. Howell & Son, in which they say, " We have examined the statements of general and particular average, and the accounts relating thereto, which you handed us some days ago, respecting the expenses incurred on the brig Gracchus, at New Orleans. Although some of the charges are of a description for which the company is not liable

by the terms of their policy; yet wishing to act liberally in the case, we have agreed to admit every item in the accounts, and the different amounts will be as follows." Here follows a statement, deducting from the repairs one-third new for old, and admitting the sum of two thousand four hundred and nine dollars and eleven cents to be due to the plaintiffs, and enclosing the premium note and a check for the amount. The letter then adds, " If you find any other charge, &c. has been paid at New Orleans, in order to raise the funds on bottomry; we will pay our full proportion of the same, upon being made acquainted with the amount." On the same day Messrs. Howell & Son returned an answer, refusing to receive the premium note and check, adding, " We should do them (the owners) great injustice to make such a settlement. Our opinion is, that in law and equity, they have a claim for a total loss."

These are the principal facts material to be mentioned; though much other evidence was introduced into the cause upon collateral points, by the parties.

The counsel for the defendants, after the evidence on each side was closed, moved the court to instruct the jury as follows:

Defendants' 1st Prayer.—The defendants, by their counsel, pray the court to instruct the jury that the notice of abandonment of the 22d April, 1833, and the accompanying letter from captain Snow, of the 25th of March, as given in evidence by the plaintiffs, do not show or disclose facts which in law justifies the offer to abandon then made; and therefore, that in the absence of all evidence that said abandonment was accepted by the defendants, the plaintiffs are entitled to recover only for a partial loss.

2. That if the said notice of abandonment was sufficient, still the jury ought to find a verdict for a partial loss only; unless they shall believe from the evidence, that the Gracchus suffered damage from the accident that befel her on the 24th March, 1833, to more than one-half the sum at which she was valued in the policy: and that in estimating said damage, the jury ought to take the cost of her repairs only, deducting one-third therefrom, as in the case of adjusting a partial loss.

3. That if the said abandonment was sufficient, as is assumed in the preceding prayer, still the jury ought to find a verdict for a partial loss only; unless they shall believe upon the evidence, that the damage so sustained by said brig exceeded in amount one half the sum at which she was valued in the policy; and that in estimating the

[Bradlie et al. v. The Maryland Insurance Company.]

cost of her repairs for the purpose of ascertaining the amount of such damage, the jury are bound to deduct one-third therefrom, as in the case of a partial loss.

4. That if said abandonment was sufficient, still the jury ought to find a partial loss only, unless they shall believe that the damage as aforesaid was more than one-half the value of the said brig at the time the accident happened, according to the proof of such value as given in evidence: and that in estimating the amount of such damage, the jury are to take the amounts of the general and particular averages as adjusted at New Orleans, deducting one-third from the actual cost of repairs.

But the court refused to give the instructions prayed for, and gave to the jury the following instruction: If the jury find from the evidence, that the Gracchus was so damaged by the disaster mentioned in the letter of captain Snow, of March 25th, 1833, that she could not be got off and repaired without an expenditure of money to an amount exceeding half her value, at the port of New Orleans, after such repairs were made, then the plaintiffs are entitled to recover for a total loss, under the abandonment made on the 22d day of April, 1833; and in ascertaining the amount of such expenditure, the jury must include the sum for which the brig was liable to the salvors, according to the decree of the district court of Louisiana, stated in the evidence: but if the jury find that the vessel could have been got off and repaired, without an expenditure of money to the amount of more than half her value; then, upon the evidence offered, the plaintiffs are not entitled to recover for a total loss, on the ground that the voyage was retarded or lost, nor on account of the arrest and detention of the vessel by the admiralty process, issued at the instance of the salvors.

The defendants excepted to the refusal of the court to give the instructions prayed; and also to the opinion actually given by the court in their instructions to the jury. The plaintiffs also excepted to the same opinion given by the court.

The plaintiffs also prayed "the court to direct the jury, that in this cause the insured, by their letter of the 22d April, authorized and required the proper expenditures to be made upon the vessel, for which said underwriters are liable under their policy: that no funds being supplied by them in New Orleans to meet this loss; and the salvage and repairs having been paid for by money raised upon respondentia upon the vessel; if the jury shall find that said vessel, under the lien of this bond, came to Baltimore, and the defendants

were then apprized of the existence of such respondentia, and were also informed of the existence of, the proceedings thereupon against said vessel, and they neglected to pay so much thereof as they ought to have paid to relieve said vessel, and omitted to place her in the hands of the owners, discharged of so much of such bottomry as the underwriters were liable for, and in consequence thereof, said vessel was libelled and condemned and sold, and thereby wholly lost to the plaintiffs; then the plaintiffs are entitled to recover for the whole value of the vessel."

The court refused to give this instruction, and the plaintiffs excepted to the refusal; and the court signed a bill of exceptions upon both exceptions. The jury found a verdict for the plaintiffs for three thousand four hundred and eighty-nine dollars and twenty-two cents; upon which judgment passed for the plaintiffs. And the present writ of error is brought by the plaintiffs for the purpose of reviewing the instructions above stated, so far as they excepted thereto.

Although the prayers for the instructions by the defendants are not before the Court for the purpose of direct consideration, as the defendants have brought no writ of error; yet it is impossible completely to understand the nature and extent and proper construction of the opinion given by the court, without adverting to the propositions contained in them; for to them, and to them only was the opinion of the court given as a response.

The second instruction asked by the defendants, in substance insisted, that to entitle the plaintiffs to recover for a total loss the damage to the Gracchus from the accident should be more than one-half the sum at which she was valued in the policy; and that in estimating the damage, the costs of the repairs only were to be taken, deducting one-third new for old. In effect, therefore, it excluded all consideration of the salvage, in the ascertainment of the loss.

The third instruction was, in substance, similar to the second, except that it did not insist upon the exclusion of the salvage. In effect, therefore, it insisted upon the valuation in the policy, as the standard by which to ascertain whether the damage was half the value of the Gracchus, or not.

The fourth instruction insisted, that to entitle the plaintiffs to recover for a total loss, the damage must exceed one-half the value of the Gracchus at the time of the accident; and that in estimating the damage, the general and particular averages, as adjusted at New Orleans, were to be taken, deducting one-third new for old. In effect,

therefore, it insisted that nothing but these adjustments were to be taken into consideration; in ascertaining the totality of the loss at the time of the abandonment; (admitting the abandonment to be sufficient;) however imminent might be the dangers, or great the losses then actually impending over the Gracchus. And all three of these prayers further insisted, that the deduction of one-third new for old should be made from the amount of the repairs, as in the case of a partial loss; in ascertaining whether there was a right to abandon for a total loss, upon the ground that the damage exceeded a moiety of the value of the vessel.

The jury found a verdict for the plaintiffs for a partial loss, assessing the damages at three thousand four hundred and eighty-nine dollars and twenty-two cents, upon which the court gave a judgment: on this judgment the plaintiffs entered a credit for four hundred and eighty-five dollars and twenty-two cents, the amount of the premium note, and interest. The plaintiffs prosecuted this writ of error.

The case was argued by Mr. Johnson for the plaintiffs in error: and by Mr. Meredith and Mr. Stewart for the defendants.

Mr. Johnson contended that the judgment of the circuit court should be reversed, on the following grounds:

First. That, under the circumstances of the case, the loss of the voyage in which the Gracchus was engaged, by the peril she sustained, entitled the plaintiffs to recover for a total loss.

Second. That the claim for salvage, and the arrest and detention of the brig consequent thereon, entitled plaintiffs to recover for such loss; and,

Third. That the court erred in not granting the prayer in plaintiffs' second exception.

It is assumed that the abandonment was sufficient. The defendants objected to its form; that no cause, or a sufficient cause for it was not assigned: but the court decided against these objections.

The instructions of the court, by which the jury were authorized to allow, in the estimate of the loss, one-third of the cost of the new for old, were altogether erroneous. The plaintiffs claimed for a technical total loss, on the state of things at the time of the abandonment. The validity of such a claim cannot be denied, if at that time the state of the facts was such as to justify the abandonment. This was in truth such as to induce the plaintiffs to consider a total loss

as inevitable. 'The letter of captain Snow, of 25th March, upon ,which the abandonment was made on the 22d of April, 1833; showed that the salvors were about to proceed against the vessel; and stated that they claimed fifty per cent. as their salvage. In 3 Kent's Commentaries, 308, the authorities on the subject of abandonment are summed up.

The value of the vessel was ten thousand dollars; for this sum she was insured. The whole sum received for her was but about four thousand dollars. This is the best evidence of the character of the loss sustained by the assured.

What was the situation of the vessel, from all the information which had been received, on the 23d of April, 1833, when she was abandoned? Was there not imminent danger of actual total loss: attached for salvage, and fifty per cent. claimed; and the voyage broken up and destroyed? The instructions of the court, that the actual amount of salvage ultimately paid, was to furnish the rule to estimate the loss, were erroneous. The probable loss, at the time of the abandonment, is to fix the rule for abandonment. In this the law of insurance in this country, and in England, differ.

The loss of the voyage, by the happening of one of the perils insured against, was a good foundation for abandonment, and for a recovery for a total loss. The vessel was on her home voyage from New Orleans; and was obliged to return to New Orleans by reason of the accident, and the course of the salvors. The voyage was thus broken up. The libel for salvage, and the detention of the vessel for repairs, were destructive of the voyage.

The voyage insured terminated on the 22d of May; and all the injury to the vessel, and the detention consequent to it, were within the period of her protection by the insurance. Had the fifty per cent. claimed by the salvors been paid, no doubt of a technical total loss would have existed; but the master remained at New Orleans, as it was his duty, and to which he was bound by his obligations to the underwriters, to contest this claim; and this detention kept the vessel beyond the six months covered by the policy. Thus the detention was within the policy. Cited 3 Kent's Commentaries; 11 John. 293; 2 Starkie's Rep. 571.

The insurance having been on time makes no difference in estimating her loss. It was an insurance of the vessel on her voyage, and during the time; and a guaranty that the vessel should have the physical ability, during that time, to continue the voyage.

[Bradlie et al. v. The Maryland Insurance Company.]

The detention of the vessel after the accident, gave a full and legal right to abandon. The detention was one of the sea risks insured against, and all legal detentions were within the policy.

It is also contended that the underwriters were bound to pay the bottomry bond executed at New Orleans, for the repairs of the vessel, the salvage, and the expenses. The underwriters were certainly liable to pay the whole of these charges; and by neglecting to do so, the vessel has been sold and taken from her owners. Thus a total loss has resulted.

It is admitted that a detention of a vessel insured, by admiralty process is not a cause of abandonment, when such detention is for some cause not coming within any of the risks of the policy; but in this case, the detention was on account of one of the perils insured against. Thus the loss of the voyage has resulted from one of the perils insured against.

Mr. Stewart and Mr. Meredith for the defendants, denied that there was any error in the instructions of the circuit court.

Insurance is a contract for indemnity; and this contract is fully carried out by the verdict of the jury. The jury have given the plaintiffs all they paid as salvage, and all the costs and expenses of the repairs consequent to the injury sustained by the vessel. But it is contended, by the plaintiffs, that the adventure in which the vessel is engaged, the voyage, and its results, upon which the vessel is proceeding, is a part of the contract for protection by the underwriters. This is not the nature of insurance. The underwriters are only liable for the perils insured.

Assuming the principle to be, in the United States, that underwriters are liable for the state of the loss at the time of the abandonment; there was no ground for the abandonment when the letter from captain Snow was received. The circumstances stated in that letter do not warrant the allegation that technical total loss had occurred. The vessel had suffered injury; she had been rescued from greater loss by the steamboat; she had been carried to New Orleans, and fifty per cent. was claimed as salvage; but the justice of this claim was denied, and it was to be contested.

With this letter, the insured and the underwriters were in possession of all the facts; and the claim of fifty per cent. as salvage, must have been seen to be unreasonable and unjust. It exceeded the usual charge for the use of a steamboat on the Mississippi, which

was known to be at the rate of ten dollars per day. There was not then, a probability that a technical total loss existed at that time; and subsequent circumstances showed that no loss, for which the assurers were liable, had occurred to the extent of fifty per cent. on the value of the vessel. If the appearance of events, when the letter from captain Snow was received, authorized the expectation that the loss would amount to fifty per cent.; the underwriters have a right to look at subsequent circumstances, to decide what was the real condition of the vessel at that time.

The Court will find, by a reference to the whole of the facts in the case, there was no foundation for the claim for a technical total loss. No damage had been sustained, which would support such a claim.

The whole cost of the repairs of the vessel, and the amount of salvage allowed by the court, amounted together to two thousand nine hundred and thirty-five dollars. The orders for insurance show that the Gracchus was valued at ten or twelve thousand dollars. At New Orleans, the Gracchus was worth eight thousand five hundred dollars. The captain was offered that sum for her; and he said he would take nine thousand dollars. Thus she was worth at New Orleans and at Baltimore nearly the same sum, and there was no approximation to half of her value by the actual loss.

To proceed to the points made for the defendants in the circuit court.

The court instructed the jury, on the points submitted by the defendants.

If the jury find from the evidence that the Gracchus was so damaged by the disaster mentioned in the letter of captain Snow, of March 25th, 1833, that she could not be got off and repaired without an expenditure of money to an amount exceeding half her value, at the port of New Orleans, after such repairs were made; then the plaintiffs are entitled to recover for a total loss, under the abandonment made on the 22d day of April, 1833; and in ascertaining the amount of such expenditure, the jury must include the sum for which the brig was liable to the salvors, according to the decree of the district court of Louisiana, stated in the evidence; but if the jury find that the vessel could have been got off and repaired without an expenditure of money to the amount of more than half her value, then upon the evidence offered the plaintiffs are not entitled to recover for a total loss, on the ground that the voyage was retarded or

lost, nor on account of the arrest and detention of the vessel by the admiralty process issued at the instance of the salvors.

The question was whether the amount of repairs, and the salvage was half the value of the vessel at New Orleans, giving the assured the benefit in the estimate of the amount of the salvage. Is this an open question in this Court? The policy expired on the 22d of May, 1833. How far is this point settled in the case of Alexander v. The Baltimore Insurance Company? 9 Cranch, 370; 2 Cond. Rep. 143.

In that case Mr. Chief Justice Marshall says, that it has been decided that the state of the fact must concur with the information to make the abandonment for a technical total loss effectual. Cited, also, Ambler's Rep. 214; Ch. Justice Wills' Reports, 641, 644.

As to how this question has been considered in England, cited 2 Maule & Selwyn, 240, 247; Idem. 278, 286, 290, 293; 4 Maule & Selwyn, 393; 5 Maule & Selwyn, 47; Goss v. Withers, 2 Burrows, 67; Hamilton v. Mendes, Burrows, 1212.

The perils in the policy do not include the loss now set up by the plaintiffs; and there is no express assumption to insure against the kind of detention for which the loss is now claimed. It must be derived from implication, and must be a consequence of the contract between the parties to the policy of insurance.

There was no evidence in the case that the underwriters had been called upon to pay the bottomry bond and prevent the sale of the vessel; nor was any demand made on the underwriters to pay for the repairs of the vessel. The assured claimed a total loss, and did not proceed as if they held the underwriters liable to any thing but the whole amount of the policy. Cited, Da Costa v. Newnham, 2 Term Rep. 407; 2 Barnwell & Ald. 513; 3 Mason's C. C. R. 429.

It is denied that the assured have a right to abandon as for a total loss upon a mere probability of a loss which will exceed fifty per cent. This view of the rights of the assured rests only on the suggestion of Lord Ellenborough. There must be a certain subsisting loss when the abandonment is made, exceeding fifty per cent.

It is not admitted that the right to abandon for breaking up of a voyage applies to an insurance on time: Hughes on Insurance, 300, 311, 314: Smith on Mercantile Law, 17 vol. of the Law Library, 143. The insurance on time is that the vessel shall be able to proceed on the voyage during the time, and to pay the damage she may sustain during that time. It is no contract for the voyage, or against interruptions which rest upon it, other than such as are within the

perils insured against. 1 Johns. Cases, 293, 294; 5 Serg. & Rawle, 501; 2 Taunton, 362.

This voyage was not broken up or defeated: and the jury have found that the injury sustained by the vessel did not amount to fifty per cent. of her value. The finding of the jury is conclusive on this matter.

The arrest and detention of the vessel by admiralty process for salvage, did not furnish grounds for the abandonment. The vessel remained in the possession of the captain. It was a mere obstruction of the voyage, or a detention of the vessel, which might have been removed, and for which the captain was bound to relieve her. He had, as has been stated, the means to do this; there was no evidence to show that he made any exertions to do this. Cited 2 Wash. C. C. R. 331; 3 Kent's Commentaries, 304. There is no special claims in the policy which includes the loss, and it must then come within that which proceeds against perils of the sea. But by no reasoning can the loss be made to amount to fifty per cent. from perils of the sea. Cited 5 Maule & Selw. 434; 3 Mason, 437. Cited, also, 21 Serg. & Lowber's English Com. Law Rep. 41.

Mr. Justice STORY delivered the opinion of the Court:

This cause comes before the Court upon a writ of error to the circuit court of Maryland district. The original action was upon a policy of insurance dated the 22d of November, 1832, whereby the defendants, The Maryland Insurance Company, caused the plaintiffs by their agents, (William Howell & Son,) to be insured, lost or not lost, ten thousand dollars, at a premium of four per cent. on the brig Gracchus, Snow, master, (valued at that sum,) at and from Baltimore, for six calendar months, commencing that day at noon; and if she be on a passage at the expiration of the time, the risk to continue at the same rate of premium, until her arrival at the port of destination. The declaration alleged a total loss by the casting ashore and stranding of the brig on the 23d of March, 1833, in the river Mississippi. Upon the trial of the cause, it appeared in evidence, that the brig sailed from Baltimore on a voyage to New Orleans, and safely arrived there; and took on board part of her cargo, (pork and sugar) at that port on a voyage for Baltimore; and about the middle of the 23d day of March, 1833, sailed from New Orleans, intending to proceed to Sheppard's plantation, on the river Mississippi, about thirty-three miles below New Orleans, to take in the residue of her

cargo for the same voyage. At the English Turn, about twenty-two miles from New Orleans, the brig attempted to come to anchor, and in so doing lost the small bower anchor; and then dropped the best bower anchor, which brought her up. The next morning, while the brig was proceeding on her voyage, she struck on a log, broke the rudder pintles, when she fell off and went on shore. A signal was then made for a steamboat in sight; which came to the assistance of the brig; and in attempting to haul her off the hauser parted. It was then found that the brig was making water very fast. Help was obtained from a neighbouring plantation. They commenced pumping and discharging the cargo on board of the steamboat; and after discharging all the pork, and a part of the sugar, they succeeded in freeing the ship on the afternoon of the same day. She was then got off and proceeded to New Orleans, where she arrived the same night; she continuing to leak, and both pumps being kept going all the time. The next day the master understood that the steamboat claimed a salvage of fifty per cent., and intended to libel for it. On the 27th of the same month the brig was taken across the river for repairs. On the same day the brig was libelled for the salvage in the district court of Louisiana.

On the 25th of March, Snow, the master, wrote a letter to one of the owners, containing an account of the loss and state of the brig; and also of the claim by the salvors of fifty per cent., which the underwriters on the cargo and himself had objected to: adding that they should hold the steamboat liable for any damage that might be incurred on account of the detention.

On the 22d of April, Messrs. Howell & Sons addressed a letter to the company, submitting the letter of the 25th of March to the company, and say therein: "In consequence of the damage, together with the detention that must grow out of a lawsuit, (in which it appears that the vessel is involved,) the voyage being broken up; we do hereby abandon to you the brig Gracchus, as insured in your office, per policy No. 13,703, and claim for a total loss." On the same day the company returned an answer, saying: "We cannot accept the abandonment tendered in your letter of this date; but expect you to do what is necessary in the case, for the safety and relief of the vessel."

On the 9th of the ensuing May, the district court decreed one-quarter of the value of the vessel and cargo (estimated at seven thousand dollars) as salvage; the brig being valued at two thousand five

[Bradlie et al. v. The Maryland Insurance Company.]

hundred dollars. On the 14th of the same month the master got possession again of the brig, the salvage having been paid. On the 3d of June, 1833, the brig was repaired and ready for a freight: and early in July she sailed for Baltimore, with a partial cargo on board on freight; and duly arrived there in the latter part of the same month. The repairs at New Orleans amounted to the sum of one thousand six hundred and ninety dollars and fifteen cents; and the share of the brig, at the general average or salvage, to the sum of one thousand two hundred and forty-five dollars and seven cents; in the whole, amounting to two thousand nine hundred and thirty-five dollars and twenty-two cents. To meet this sum and some other expenses, the master obtained an advance from Messrs. Harrison, Brown & Co., of New Orleans, of three thousand seven hundred and fifteen dollars and forty-one cents; and gave them as security therefor, a bottomry bond on the Gracchus for the principal sum, and five per cent. maritime premium, payable on the safe arrival of the brig at Baltimore.

On this bottomry bond the brig was libelled in Baltimore; and no claim being interposed by any person, she was by a decree of the district court of Maryland, on the 5th of September, 1833, ordered to be sold to satisfy the bottomry bond; and she was accordingly sold by the marshal about the 20th of the same month, to John B. Howell, for four thousand seven hundred and fifty dollars; and on the 24th of the same month there was paid to the attorney of the libellant, the full amount due under the decree of the court. On the same day, the president of the company addressed a letter to Messrs. Howell & Son, in which they say, "We have examined the statements of general and particular average, and the accounts relating thereto, which you handed us some days ago, respecting the expenses incurred on the brig Gracchus, at New Orleans. Although some of the charges are of a description for which the company is not liable by the terms of their policy; yet, wishing to act liberally in the case, we have agreed to admit every item in the accounts, and the different amounts will be as follows." Here follows a statement, deducting from the repairs one-third new for old, and admitting the sum of two thousand four hundred and nine dollars and eleven cents to be due to the plaintiffs; and enclosing the premium note, and a check for the amount. The letter then adds, " If you find any other charge, &c., has been paid at New Orleans, in order to raise the funds on bottomry, we will pay our full proportion of the same, upon being made acquainted with the amount." On the same day Messrs. Howell &

Son returned an answer, refusing to receive the premium note and check, adding, "We should do them (the owners) great injustice to make such a settlement. Our opinion is, that in law and equity, they have a claim for a total loss."

These are the principal facts material to be mentioned, though much other evidence was introduced into the cause upon collateral points, by the parties.

The counsel for the defendants, after the evidence on each side was closed, moved the court to instruct the jury as follows:

Defendants' 1st Prayer—The defendants, by their counsel, pray the court to instruct the jury that the notice of abandonment of the 22d April, 1833, and the accompanying letter from captain Snow, of the 25th of March, as given in evidence by the plaintiffs, do not show or disclose facts which in law justify the offer to abandon then made; and therefore, that in the absence of all evidence that said abandonment was accepted by the defendants, the plaintiffs are entitled to recover only for a partial loss.

2. That if the said notice of abandonment was sufficient, still the jury ought to find a verdict for a partial loss only; unless they shall believe from the evidence, that the Gracchus suffered damage from the accident that befel her on the 24th March, 1833, to more than one-half the sum at which she was valued in the policy; and that in estimating said damage, the jury ought to take the cost of her repairs only, deducting one-third therefrom, as in the case of adjusting a partial loss.

3. That if the said abandonment was sufficient, as is assumed in the preceding prayer, still the jury ought to find a verdict for a partial loss only; unless they shall believe, upon the evidence, that the damage so sustained by said brig exceeded in amount one-half the sum at which she was valued in the policy: and that in estimating the cost of her repairs for the purpose of ascertaining the amount of such damage, the jury are bound to deduct one-third therefrom, as in the case of a partial loss.

4. That if said abandonment was sufficient, still the jury ought to find a partial loss only; unless they shall believe that the damage as aforesaid was more than one-half the value of the said brig at the time the accident happened, according to the proof of such value as given in evidence: and that in estimating the amount of such damage, the jury are to take the amounts of the general and particular ave-

rages as adjusted at New Orleans, deducting one-third from the actual cost of repairs.

But the court refused to give the instruction prayed for, and gave to the jury the following instruction: If the jury find from the evidence, that the Gracchus was so damaged by the disaster mentioned in the letter of captain Snow, of March 25th, 1833, that she could not be got off and repaired without an expenditure of money to an amount exceeding half her value, at the port of New Orleans, after such repairs were made; then the plaintiffs are entitled to recover for a total loss, under the abandonment made on the 22d day of April, 1833: and in ascertaining the amount of such expenditure, the jury must include the sum for which the brig was liable to the salvors, according to the decree of the district court of Louisiana stated in the evidence: but if the jury find that the vessel could have been got off and repaired, without an expenditure of money to the amount of more than half her value, then upon the evidence offered, the plaintiffs are not entitled to recover for a total loss, on the ground that the voyage was retarded or lost; nor on account of the arrest and detention of the vessel by the admiralty process, issued at the instance of the salvors.

The defendants excepted to the refusal of the court to give the instructions prayed: and also to the opinion actually given by the court in their instructions to the jury. The plaintiffs also excepted to the same opinion, given by the court.

The plaintiffs also prayed " the court to direct the jury, that in this cause the insured, by their letter of the 22d April, authorized and required the proper expenditures to be made upon the vessel, for which said underwriters are liable under their policy; that no funds being supplied by them in New Orleans to meet this loss, and the salvage and repairs having been paid for by money raised upon respondentia upon the vessel; if the jury shall find that said vessel, under the lien of this bond, came to Baltimore, and the defendants were then apprized of the existence of such respondentia, and were also informed of the existence of the proceedings thereupon against said vessel, and they neglected to pay so much thereof as they ought to have paid to relieve said vessel; and omitted to place her in the hands of the owners, discharged of so much of such bottomry as the underwriters were liable for; and in consequence thereof, said vessel was libelled and condemned and sold, and thereby wholly lost to the

plaintiffs; then the plaintiffs are entitled to recover for the whole value of the vessel."

The court refused to give this instruction, and the plaintiffs excepted to the refusal; and the court signed a bill of exceptions upon both exceptions. The jury found a verdict for the plaintiffs for three thousand four hundred and eighty-nine dollars and twenty-two cents; upon which judgment passed for the plaintiffs. And the present writ of error is brought by the plaintiffs for the purpose of reviewing the instructions above stated, so far as they excepted thereto.

Although the prayers for the instructions by the defendants are not before the Court for the purpose of direct consideration, as the defendants have brought no writ of error; yet it is impossible completely to understand the nature and extent, and proper construction of the opinion given by the court, without adverting to the propositions contained in them; for to them, and to them only was the opinion of the court given as a response.

The second instruction asked by the defendants, in substance, insisted, that to entitle the plaintiffs to recover for a total loss, the damage to the Gracchus from the accident should be more than one-half the sum to which she was valued in the policy; and that in estimating that damage, the costs of the repairs only were to be taken, deducting one-third new for old. In effect, therefore, it excluded all consideration of the salvage in the ascertainment of the loss.

The third instruction was in substance similar to the second, except that it did not insist upon the exclusion of the salvage. In effect, therefore, it insisted upon the valuation in the policy, as the standard by which to ascertain whether the damage was half the value of the Gracchus, or not.

The fourth instruction insisted, that to entitle the plaintiffs to recover for a total loss, the damage must exceed one-half the value of the Gracchus at the time of the accident; and that in estimating the damage, the general and particular averages, as adjusted at New Orleans, were to be taken; deducting one-third new for old. In effect, therefore, it insisted that nothing but these adjustments were to be taken into consideration, in ascertaining the totality of the loss at the time of the abandonment; (admitting the abandonment to be sufficient;) however imminent might be the dangers, or great the losses then actually impending over the Gracchus. And all three of these prayers further insisted, that the deduction of one-third new for old, should be made from the amount of the repairs, as in the case of a

[Bradlie, et al. v. The Maryland Insurance Company.]

partial loss, in ascertaining whether there was a right to abandon for a total loss, upon the ground that the damage exceeded a moiety of the value of the vessel.

The instructions of the court actually given in these prayers, involve the following propositions. 1. That if the expenditures in repairing the damage exceeded half the value of the brig at the port of New Orleans, after such repairs were made, including therein the salvage awarded to the salvors; the plaintiffs were entitled to recover for a total loss, under the abandonment made on the 22d of April, 1833. 2. If the expenditures to get off and repair the brig, were less than the half of such value, then the plaintiffs were not entitled to recover for a total loss, upon the ground that the voyage was retarded or lost; nor on account of the arrest and detention of the brig, under the admiralty process, for the salvage.

The question is, whether these instructions were correct. In considering the first, it is material to remark, that by the well settled principles of our law, the state of the facts, and not the state of the information at the time of the abandonment, constitutes the true criterion by which we are to ascertain whether a total loss has occurred or not, for which an abandonment can be made. If the abandonment, when made, is good, the rights of the parties are definitively fixed; and do not become changed by any subsequent events. If, on the other hand, the abandonment, when made, is not good, subsequent circumstances will not affect it so as, retroactively, to impart to it a validity which it had not at its origin. In some respects, our law on this point differs from that of England; for, by the latter, the right to a total loss vested by an abandonment, may be divested by subsequent events, which change that total loss into a partial loss. It is unnecessary to cite cases on this subject, as the diversity is well known; and the courts in neither country have shown any disposition of late years to recede from their own doctrine. The cases of Rhinelander v. The Insurance Company of Pennsylvania, 4 Cranch, 29; and Marshall v. The Delaware Insurance Company, 4 Cranch, 202, are direct affirmations of our rule: and those of Bainbridge v. Neilson, 10 East's Rep. 329; Patterson v. Ritchie, 4 M. & Selw. 394; and M'Iver v. Henderson, 4 M. & Selw. 584; of the English rule.

In cases where the abandonment is founded upon a supposed technical total loss, by a damage or injury exceeding one-half the value of the vessel, although the fact of such damage or injury must exist

at the time, yet it is necessarily open to proofs, to be derived from subsequent events. Thus, for example, if the repairs, when subsequently made, clearly exceed the half value, it is plain that this affords one of the best proofs of the actual damage or injury. On the other hand, if the subsequent repairs are far below the half value, this, so far as it goes, affords an inference the other way. But it is not, and in many cases cannot be decisive of the right to abandon. In many cases of stranding, the state of the vessel at the time may be such, from the imminency of the peril, and the apparent extent of expenditures required to deliver her from it, as to justify an abandonment; although, by some fortunate occurrence, she may be delivered from her peril, without an actual expenditure of one-half of her value after she is in safety. Under such circumstances, if, in all human probability, the expenditures which must be incurred to deliver her from her peril, are, at the time, so far as any reasonable calculations can be made, in the highest degree of probability, beyond half value; and if her distress and peril be such as would induce a considerate owner, uninsured, and upon the spot, to withhold any attempt to get the vessel off, because of such apparently great expenditures, the abandonment would doubtless be good. It was to such a case that lord Ellenborough alluded, in Anderson v. Wallis, 2 M. & Selw., when he said: "There is not any case, nor principle, which authorizes an abandonment, unless where the loss has been actually a total loss, or in the highest degree probable at the time of the abandonment." Mr. Chancellor Kent, in his learned Commentaries, vol. 3, 321, has laid down the true results of the doctrine of law on this subject. "The right of abandonment (says he,) does not depend upon the certainty, but upon the high probability of a total loss, either of the property or of the voyage, or both. The insured is to act, not upon certainties, but upon probabilities; and if the facts present a case of extreme hazard, and of probable expense, exceeding half the value of the ship, the insured may abandon; though it should happen that she was afterwards recovered at a less expense." We have no difficulty, therefore, in acceding to the argument of the counsel for the plaintiffs in error on this point. But its application to the ruling of the court, will be considered hereafter.

In respect to the mode of ascertaining the value of the ship, and, of course, whether she is injured to the amount of half her value, it has, upon the fullest consideration, been held by this Court, that the true basis of the valuation is the value of the ship at the time of the

disaster; and that, if after the damage is or might be repaired, the ship is not, or would not be worth, at the place of the repairs, double the cost of the repairs, it is to be treated as a technical total loss. This was the doctrine asserted in the Patapsco Insurance Company v. Southgate, 5 Peters, 604; in which the court below had instructed the jury, that, if the vessel could not have been repaired without an expenditure exceeding half her value at the port of the repairs, after the repairs were made, it constituted a total loss. This Court held that instruction to be entirely correct. It follows, from this doctrine, that the valuation of the vessel in the policy, or the value at the home port, or in the general market of other ports, constitutes no ingredient in ascertaining whether the injury by the disaster is more than one-half the value of the vessel, or not. For the like reason, the ordinary deduction in cases of a partial loss of one-third new for old, from the repairs, is equally inapplicable to cases of a technical total loss, by an injury exceeding one-half of the value of the vessel. That rule supposes the vessel to be repaired and returned to the owner; who receives a correspondent benefit from the repairs beyond his loss, to the amount of the one-third. But in the case of a total loss, the owner receives no such benefit; the vessel never returns to him, but is transferred to the underwriters. If the actual cost of the repairs exceeds one-half of her value after the repairs are made, then the case falls directly within the predicament of the doctrine asserted in the case of 5 Peters, 604. The same limitations of the rule, and the reasons of it, are very accurately laid down by Mr. Chancellor Kent, in his Commentaries, 3 vol. 330; and in Da Costa v. Newnham, 2 Term Rep. 407.

If, with these principles in view, we examine the first instruction given in this case in the circuit court, it will be found to be perfectly correct. Indeed, that part of the instruction which declares that if the brig " could not be got off and repaired without an expenditure of money to an amount exceeding half her value at the port of New Orleans, after such repairs were made, then the plaintiffs are entitled to recover for a total loss under the abandonment," is precisely in the terms of the instruction given in The Patapsco Insurance Company v. Southgate, 5 Peters, 604. The error, which has been insisted on at the argument by the plaintiffs, is in the additional direction; that " in ascertaining the amount of such expenditure, the jury must include the sum for which the brig was liable to the salvors, according to the decree of the district court of Louisiana, stated in

the evidence:" which, it is contended, removed from the considera-tion of the jury the right to take into the account the high probabi-lity, at the time of the abandonment, of the allowance of a greater salvage, and even to the extent of the fifty per cent. then claimed by the salvors. And in support of the argument, it is insisted that the state of the facts, and the high probabilities at the time of the aban-donment, constitute the governing rule; and not, the ultimate result in the subsequent events. But it appears to us that the argument is founded upon a total misunderstanding of the true import of this part of the instruction. The court did not undertake to say, and did not say, that the jury might not properly take into consideration the high probability of a larger salvage at the time of the abandonment; but simply, that the jury must include in the half value, the amount of the actual salvage decreed, because that was, in truth, a part of the loss. The instruction was, therefore, not a limitation restrictive of the rights and claims of the plaintiffs; but, in fact, a direction in fa-vour of their rights and claims, and in support of the abandonment. This is demonstrated by the then actual position of the cause. The defendants had asked an instruction that the costs of the repairs only, exclusive of the salvage, should be taken into consideration in esti-mating the half value; and also that the one-third new for old, should be deducted from the amount of the cost, in estimating the half value. The court, in effect, negatived both instructions; and in the particulars now objected to, there was a positive direction to the jury not to exclude, but to include the salvage, in the estimate of the loss. In this view of the matter, the instruction was most favourable to the plaintiffs; and, so far from excluding evidence which might show the amount of the actual damage at the time of the abandon-ment; it resorted, and very properly resorted to the subsequent as-certainment of salvage as positive evidence, that to that extent at least, the actual damage was enhanced beyond the cost of the repairs. We are entirely satisfied with this part of the instruction, in this view, which seems to us to be the true interpretation of it.

In respect to the other part of the instruction there is no substan-tial difficulty. The mere retardation of the voyage by any of the perils insured against, not amounting to or producing a total inca-pacity of the ship eventually to perform the voyage, cannot, upon principles well established, be admitted to constitute a technical total loss, which will authorize an abandonment. A retardation for the purpose of repairing damages from the perils insured against, that

damage not exceeding one moiety of the value of the ship, falls directly within this doctrine. Under such circumstances, if the ship can be repaired and is repaired, and is thus capable of performing the voyage, there is no ground of abandonment founded upon the consideration that the voyage may not be worth pursuing for the interest of the ship owner; or that the cargo has been injured, so that it is not worth transporting further on the voyage: for the loss of the cargo for the voyage, has nothing to do with an insurance upon the ship for the voyage. This was expressly held by this Court, in the case of Alexander v. The Baltimore Insurance Company, 4 Cranch R. 370; where it was decided that an insurance on a ship for a voyage, was not to be treated as an insurance on the ship and the voyage, or as an undertaking that she shall actually perform the voyage: and, only, that notwithstanding any of the perils insured against, she shall be of ability to perform the voyage; and that the underwriters will pay any damage sustained by her, from those perils, during the voyage. The Court farther held, that upon such an insurance, a total loss of the cargo for the voyage, was not a total loss of the ship for the voyage. In respect to the point of retardation for repairs, the more recent authorities contain reasoning altogether satisfactory, and consistent with the true nature and objects of policies of insurance. The subject was a good deal discussed in the case of Anderson v. Wallis, 2 Maule & Selw. 240, which was a policy on cargo; and again in Everth v. Smith, 2 M. & Selw. 278, which was a policy on freight; and again in Falkner v. Ritchie, 2 M. & Selw. 290, which was a policy on ship: and in each of the cases, the court came to the conclusion that a mere retardation of the voyage by any peril insured against, did not entitle the insured to recover for a total loss; if the thing insured was capable of performing the voyage. Lord Ellenborough, in the first case, said: "Disappointment of arrival is a new head of abandonment in insurance law." "If the retardation of the voyage be a cause of abandonment, the happening of any marine peril to the ship, by which a delay is caused in her arrival at the earliest market, would also be a cause of abandonment. I am well aware that an insurance upon a cargo, for a particular voyage, contemplates that the voyage shall be performed with that cargo; and any risk which renders the cargo permanently lost to the assured, may be a cause of abandonment. In like manner a total loss of cargo may be effected not merely by the destination of that cargo, but by a permanent incapacity of the ship

[Bradlie et al. v. The Maryland Insurance Company.]

to perform the voyage; that is, a destruction of the contemplated adventure. But the case of an interruption of the voyage, does not warrant the assured in totally disengaging himself from the adventure, and throwing this burthen on the underwriters." In Falkner v. Ritchie, 2 M. & Selw. 290, his lordship added: "What has a loss of the voyage to do with a loss of the ship?" meaning, as the context shows, that the loss of the voyage is no ground of abandonment, where the ship is not damaged to an extent which permanently disables her to perform it. The same doctrine was affirmed in Hunt v. Royal Exchange Assurance Company, 5 M. & Selw. 47; and in Naylor v. Taylor, 9 Barn. & Cresw. 718. And it was long ago recognised by this Court, by necessary implication, in the case of Alexander v. Baltimore Insurance Company, 4 Cranch R. 370; and Smith v. The Universal Insurance Company, 6 Wheat. R. 176. In this latter case, the Court said: "The insurers do not undertake that the voyage shall be performed without delay, or that the perils insured against shall not occur. They undertake only for losses sustained by those perils; and if any peril does act upon the subject, yet if it be removed before any loss takes place, and the voyage be not thereby broken up, but is, or may be resumed, the insured cannot abandon for a total loss." Language more explicit upon this point, could scarcely have been used.

Nor is there any, the slightest difference in law, whether the retardation or temporary suspension of the voyage be for the purpose of repairs, or to meet any other exigency which interrupts, but does not finally defeat the actual resumption of it. The detention of the ship, under the admiralty proceedings, does not, therefore, in any manner change the posture of the case. It is admitted on all sides, and indeed it admits of no legal controversy, that this detention cannot be construed to be a substantive peril within the clause of the policy respecting "restraints and detainments of all kings, princes or people;" for the restraints and detainments there alluded to, are the operations of the sovereign power by an exercise of the vis major, in its sovereign capacity, controlling or divesting, for the time, the dominion or authority of the owner over the ship; and not proceedings of a mere civil nature to enforce private rights, claimed under the owner for services actually rendered in the preservation of his property. This, indeed, if it admitted of any doubt, would be disposed of by the reasoning of the court in Nesbitt v. Lushington, 4 Term R. 783; and Thornely v. Hebson, 2 Barn. & Ald. R. 513. See

also 3 Kent's Comm. 304, 326. In truth the detention by the admiralty process was, in this case; as is apparent from the admitted facts, a mere retardation of the voyage. The brig was delivered from that proceeding; the salvage was paid; and she not only was capable, but did in fact resume and complete her voyage to Baltimore.

The considerations already suggested, dispose of the other point raised under this instruction, as to the loss of the voyage. It is apparent that the loss of the voyage spoken of, and necessarily implied in this instruction upon the admitted state of the facts, was the loss of the cargo for the voyage, and not the loss of the vessel by incapacity to perform the voyage. If the vessel could, as the instruction supposes, be got off and repaired without an expenditure exceeding half her value, and be thereby enabled to resume the voyage; it is plain that the loss of the cargo for that voyage, constituted no total loss of the vessel for the voyage. It was absolutely impossible for the court, upon the authorities already cited, to arrive at any other conclusion.

The state of things at the time of the abandonment, did not demonstrate any incapacity of the ship to resume her voyage after the repairs; and in point of fact, as has been already suggested, she not only did resume it, but actually performed it. The insurance was upon time; and the policy actually expired, by its own limitation, upon the 22d of May, 1833, before she had actually resumed her voyage. But that can make no difference. An insurance on time differs as to this point in no essential manner whatsoever from an insurance upon a particular voyage; except in this, that in the latter case the insurance is upon and for a specific voyage described in the policy; whereas a policy on time, insures no specific voyage, but it covers any voyage or voyages whatsoever undertaken within, and not exceeding in point of duration, the limited period for which the insurance is made. But an insurance on time by no means contains any undertaking on the part of the underwriters, that any particular voyage undertaken by the insured within the prescribed period, shall be performed before the expiration of the policy. It warrants nothing as to any retardation or prolongation of the voyage; but only that the ship shall be capable of performing the voyage undertaken, notwithstanding any loss or injury which may accrue to her during the time for which she is insured; and of resuming it, if interrupted. In other words, the undertaking is that the ship shall not, by the operation of any peril insured against during the time

for which the policy continues, be totally and permanently lost or disabled from performing the voyage then in progress, or any other voyage within the scope of the policy. The case of Pole v. Fitzgerald, Willes' Rep. 641; S. C. Amber's Rep. 214, affords a striking illustration of this doctrine; and whatever doubts may be entertained as to some of the dicta in that case, lord Ellenborough has well said, that it may be of great use to resort to it, in order to purify the mind from these generalities, respecting the loss of the voyage of the ship, constituting, per se, a loss of the ship. Falkner v. Ritchie, 2 Maule & Selw. 293. There is no error, then, in the instructions actually given to the jury in the response of the court to those asked by the defendants.

In the next place, as to the instruction asked by the plaintiffs, and refused by the court. In substance, it insisted that if the underwriters had authorized the expenditures to be made for the repairs, and had not supplied the appropriate funds for these repairs, and for the salvage, and the bottomry bond was given to secure them; and the underwriters were apprized of the admiralty proceedings at Baltimore, and there neglected to pay so much thereof as they ought to have paid to discharge the same; and that the vessel in consequence thereof was sold under those proceedings: then the plaintiffs were entitled to recover for the whole value of the vessel. This instruction, it may be remarked, proceeds upon the supposition that there was not a technical total loss, entitling the plaintiffs to abandon; and that the abandonment of the 22d of April was not available for the plaintiffs. For, if it had been, then the underwriters would have become from that time the owners of the ship; and the subsequent losses, whatever they might be, would be on their sole account. The case put, then, supposes that, in point of law, in the case of a merely partial loss to the ship, if money is taken up on bottomry for the necessary repairs and expenditures, it becomes the duty of the underwriters to deliver the ship from the bottomry bond to the extent of their liability for the expenditures; and that if they do not, and the vessel is sold under the bottomry bond, they are liable not only for the partial loss, but for all other losses to the owner from their neglect. We know of no principle of law which justifies any such doctrine. The underwriters engage to pay the amount of the expenditures and losses, directly flowing from the perils insured against; but not any remote or consequential losses to the owners, from their neglect to pay the same. It might be as well contended,

[Bradlie et al. v. The Maryland Insurance Company.]

that if by the neglect to pay a partial loss the owners were prevented from undertaking a new and profitable voyage, the underwriters would be responsible to them for such consequential loss. The maxim here, as in many other cases in the law, is, causa proxima non remota spectatur. The underwriters are not bound to supply funds in a foreign port for the repairs of any damage to the ship, occasioned by a peril insured against.. They undertake only to pay the amount after due notice and proof of the loss; and, usually, this is to be done, (as was in fact the present case) after a prescribed time from such notice and proof of the loss. If to meet the expenditures for the repairs, the master is compelled to take up money on bottomry, and thereby an additional premium becomes payable, that constitutes a part of the loss, for which the underwriters are liable. But in cases of a partial loss, the money upon bottomry is not taken up on account of the underwriters, but of the owner; and they become liable to the payment of the loss, whether the bottomry bond ever becomes due and payable or not. In short, with the mode by which the owner obtains the necessary advances, they have nothing to do; except that they must bear their share of the increased expenses to furnish the repairs, as a common sacrifice. Indeed, it seems difficult to understand upon what ground it is, that in case of a partial loss the owner is exonerated from the duty of delivering his own ship from the lien of the bottomry bond, and is at liberty to throw upon the underwriters the whole obligation of discharging it, under the penalty of being otherwise responsible in case of a sale; not for their share of the loss, (assuming that they were at all bound to discharge any part of the bond,) but for the whole loss. Upon what ground can it be said that the loss of the vessel by the sale in this case, is attributable to the neglect of the underwriters, which does not equally apply to the owners. They had at least, upon their own argument, an equal duty to perform; for the underwriters were not liable for the whole amount of the bottomry bond, but for a part only; and the owners were bound to discharge the residue. How, then, can they call upon the underwriters to pay them a total loss on account of a sale; which upon their own argument was as much attributable to their own neglect as to that of the underwriters. But we wish to be understood as putting this point upon its true ground in point of law; and that is, that in the case of a partial loss, where money is taken up on bottomry bond, to defray the expenditures to repair it, the underwriters have nothing to do with the bottomry

[Bradlie et al. v. The Maryland Insurance Company.]

bond, but are simply bound to pay the partial loss, including their share of the extra expenses of obtaining the money in that mode, as a part of the loss. If it were otherwise, any partial loss, however small, might, if money were taken up on bottomry to meet it, be converted, at the will of the owner, into a total loss, if the underwriters should neglect to pay to the owner the amount of such partial loss. The case of Thornely v. Hebson, 2 Barn. & Ald. 513, inculcates a very different doctrine. It was there held, that even in the case of a libel for salvage, it is the duty of the owner, if he can, to raise the money to pay the salvage; and if he makes no such attempt, but suffers the ship to be sold under the admiralty process, he cannot thereby convert a loss, which is partial, into a total loss. And it was there further said, by Mr. Justice Bayley, (what is entirely applicable to the present case,) that the sale, in order to constitute a total loss in such a case, must be from necessity, and wholly without the fault of the owner.

The instruction asked in the present instance seems to have proceeded wholly upon the ground of the doctrine asserted in the case of Da Costa v. Newnham, 2 Term Rep. 407. But assuming that case to have been decided with entire correctness upon its own particular circumstances; it seems difficult, consistently with the principles of law, to apply the doctrine to cases which are not exactly in the same predicament; and it is not the first time that an attempt has been made to press that case into the service of other cases which are essentially different. The whole argument turns upon this, that the brig never came into the hands of the owner free from the lien of the bottomry bond; and therefore, the total loss by the sale is properly attributable to the neglect of the underwriters. But the same argument would equally have applied if there had been, for the first time, admiralty proceedings in the home port against the brig, (without any bottomry bond having been given,) for the repairs thus made in a foreign port, as well as for the salvage. Yet no doubt could have been entertained that, under such circumstances, the underwriters would not have been bound to deliver the vessel from the liens thus incurred, at the peril of otherwise becoming answerable for a total loss. In what essential particular is the case changed by the substitution of an express lien by bottomry; for an implied lien by the maritime law? In none, that we can perceive.

But what were the circumstances of the case of Da Costa v. Newnham? In that case, the insurance was for a voyage from Leg-

[Bradlie et al. v. The Maryland Insurance Company.]

horn to London. The ship met with an accident in the course of the voyage, and put into Nice for repairs. Upon receiving notice thereof, the assured wished to abandon, and, indeed, was entitled to abandon; but the underwriters insisted upon the ship's being repaired, telling him to pay the tradesmen's bills. He consented, at last, that the repairs should be done, but refused to advance any money; in consequence of which it became necessary to take up a large sum of money on a bottomry bond, to defray the expenses. The ship resumed and performed her voyage; and after her arrival, the underwriters were applied to take up the bottomry bond, but they refused. Admiralty proceedings were, as it should seem, accordingly instituted, and the ship was sold for six hundred guineas; the bottomry bond being for six hundred pounds, which, with the interest, amounted to a larger sum, viz. six hundred and seventy-eight pounds.

The question under these circumstances was, whether the plaintiff was entitled to recover. Mr. Justice Buller, who tried the cause, was of opinion, under the circumstances, that for all the subsequent injury which had accrued to the owner, in consequence of the refusal of the underwriters to discharge the bottomry bond, and by which the owner was damnified to the full amount of the insurance, the underwriters were liable; because it was their own fault in not taking up the bond for the expenses of those repairs, which had been incurred by their own express directions; and the only remaining question was, how the average was to be calculated. The jury found a verdict for the owner for sixty-two pounds nineteen shillings, which, together with seventeen pounds ten shillings paid into court by the underwriters, they calculated as the average loss, per cent. which the owner was entitled to. A motion was afterwards made for a new trial, and refused by the court; substantially upon the grounds maintained by the learned judge at the trial.

From this statement of the facts, and the reasoning of the court applicable thereto, in the case of Da Costa v. Newnham, it is apparent, that, in that case, the actual cost of the repairs, (including of necessity the bottomry premium,) exceeded the actual value of the ship; that the underwriters had fully authorized all these repairs, and had expressly promised to pay all the costs of the repairs and the necessary incidents. The owner of the ship, at the termination of the voyage, never came into the possession of the ship free from the lien of the bottomry bond; for the whole amount of which, as it included nothing but the costs and incidents of the repairs, the under-

writers were liable, and which, by necessary implication, they had promised to pay. The sum claimed by the owner of the underwriters was in fact less than the amount of the cost of the repairs, that cost being six hundred and seventy-eight pounds; whereas the loss claimed was a total loss of the ship, which sold for six hundred guineas only; and it seems that the insurance was on an open policy.

The question, in effect, therefore, was whether the owner was not entitled to recover the full amount of the insurance, which was the amount of his actual loss, directly arising from the breach of the promise of indemnity made to him by the underwriters. Upon such a point, there should not seem to be much reason for any real juridical doubt.

Now, there are essential distinctions between that case and the present. In the first place, the repairs in this case were not made under any positive engagement of the underwriters beyond what the policy, by its own terms, necessarily included. The language of the underwriters in their answers, refusing the abandonment, in our judgment imports no more than this. It merely says, " we expect you to do what is necessary in the case for the safety and relief of the vessel." It was rather an admonition than a contract; a warning that the underwriters would hold the owners to the performance of all the duties imposed upon them by law; and not any promise as to their own obligations. In the next place, in the present case, the loss is to be taken upon the very form of the instruction, prayed to be a partial loss only; and as to the repairs, the underwriters were clearly, in such a case, entitled to the deduction of one-third new for old. In the case of Da Costa v. Newnham, the loss was treated by the court as a technical total loss; on account of the amount required for the necessary repairs. In the next place, in that case, the insured asked only to recover the amount of the costs of the repairs, which in fact exceeded the value of the ship: in the present case, the cost of the repairs, and the salvage, for which the underwriters were liable, fell short of the half value; and yet the plaintiffs insist to recover for a total loss. In the next place, in that case, the underwriters, by their refusal to make any advances, compelled, and indeed authorized the owner to resort to a bottomry bond, to supply the means of repairing the loss; and of course, as has been already intimated, the underwriters, by necessary implication, undertook to indemnify the owner against the lien and burden of the whole of

that bond, in consideration of his undertaking to cause the repairs to be made.

The refusal to make good that promise, was the direct and immediate cause of the loss and sale of the ship. In the present case, the bottomry bond included charges and amounts, for which the underwriters were not liable. How, then, can it be inferred from the facts stated in the instructions, that the underwriters, by implication, and without consideration, undertook to indemnify the plaintiffs against the whole bottomry bond; for the payment of a part of which, only, they were by law responsible?

So that, admitting the authority of Da Costa v. Newnham to the fullest extent which its own circumstances warrant, it stands upon grounds entirely distinguishable from those which ought to govern the present case. If the underwriters, in the present case, had authorized the whole expenditures on their sole account, and had promised to save the plaintiffs harmless from the whole amount of the bottomry bond, and the plaintiffs had made the expenditures, and procured the advances for this purpose, upon the faith of such authority and promise; a very different case would have been presented for our consideration. At present, it is only necessary to say, that the instruction before us states no such case, and calls for no such question; and, therefore, Da Costa v. Newnham cannot be admitted to govern the present case.

Upon the whole, our opinion is, that there is no error in the instructions given or refused by the circuit court; and the judgment is therefore affirmed, with costs.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Maryland, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs and damages at the rate of six per centum per annum.