**CALMAR S. S. CORP. v. UNITED STATES.**
**CALMAR S. S. CORP. v. SCOTT et al.**

United States District Court
S. D. New York.

May 25, 1951.

Kirlin, Campbell & Keating, New York City, proctors for libelant; Edwin S. Murphy, Ira A. Campbell, and Helen C. Cunningham, New York City, of counsel.

Irving H. Saypol, U. S. Atty., New York City, proctor for respondent United States; Edward L. Smith and John A. Montgomery, Jr., New York City, of counsel.

Mendes & Mount, New York City, proctors for respondents Scott, etc.; Russell T. Mount and Walter B. Hall, New York City, of counsel.

RYAN, District Judge.

These two suits brought in the admiralty by Calmar Steamship Corporation, as owner of the S.S. Portmar, arise out of the voyage of that vessel from San Francisco which began on November 28, 1941. On that voyage she was damaged by Japanese air attacks while in the Timor Sea on February 15 and 16, 1942, and in the harbor of Port Darwin, Australia, on February 19, 1942, she was subsequently beached after these attacks near Darwin.

The suits were tried together and the findings of fact hereinafter made and the conclusions of law reached are to be applied to both suits.

The first libel (Ad. 129–295) was filed on February 11, 1944 by "Calmar" against The United States of America. The libel as filed named a number of individual respondents; as to them it has been discontinued and now proceeds only against the United States. The suit asserts claims upon a time charter party for damage to the Portmar from Japanese bombing and strafing on February 15, 16 and 19, 1942 and charter hire from March 1, 1942 (later amended to February 19) to November 17, 1942.

The United States asserts, by answer, that this court has no jurisdiction over the suit against it and, in addition, denies any liability on its part. It pleads in support of the objection to jurisdiction that the suit is not within the permission to sue contained in the Suits in Admiralty Act, Secs. 1 and 2, 46 U.S.C.A. §§ 741, 742, due to the fact that the Portmar was not a merchant vessel operated by or for the United States and because the claims asserted are not cognizable under the Public Vessels Act, Sec. 1, 46 U.S.C.A. § 781, or other governmental consent to be sued in the district court. Liability is disclaimed for the damages sustained by the Portmar as a result of enemy action because such losses are either within the coverage of the war risk insurance taken out pursuant to the provisions of the charter, or are excluded from coverage by reason of risks assumed by the owner or its failure to take out adequate insurance. Liability is denied for charter hire in addition to that paid because the obligation to pay hire terminated by express provision of the charter by reason of the Portmar's becoming a constructive total loss on that date, or in the alternative because the owner's election to treat her as such terminated the obligation to pay hire.

"Calmar" filed the second libel (Ad. 133–332) on November 15, 1944 against the war risk underwriters of the Portmar, who have rejected liability for the losses sustained on this eventful part of the voyage of the Portmar. The suit is based on three policies of war risk insurance (all to the same effect and of the same tenor, except as to amount), totalling $860,000. The libel pleads claims totalling $902,761.12 with interest, of which $860,000 is sought to be recovered for a constructive total loss of the vessel, and $42,761.12 with interest for certain "sue and labor" expenses. The libel asks that if it be held that the damage did not amount to a constructive total loss under the policies in suit, then that for a partial loss there be awarded the sum of $250,000 with interest.

The underwriters deny liability upon the ground that the vessel was not covered by the war risk insurance policies issued by them at the time the Portmar sustained the damage, because (a) she had been insured as a commercial and cargo vessel for trading and when damaged she was a ship

of war and part of an invasion expedition, (b) that the voyage covered had terminated prior to the bombing, strafing and beaching of the vessel, (c) that she had been intentionally exposed as a warship to enemy attack, (d) that the "capture, seizure, arrest, restraint, detainment, etc." rider of the policies did not cover the damage sustained, (e) that if it be determined that the insurance had not terminated at the time of the damage, the "held-covered" clause of the policies applied and the additional premiums thus due amount to not less than 75% of the insured value of the vessel, which should be set off against any recovery allowed, (f) that there was not a constructive total loss and that the tender of abandonment to the underwriters was ineffectual, and finally (g) that in view of the provisions of the charter party, there was at no time any capture, seizure, arrest, restraint or detainment of the Portmar.

The libel against the United States is largely alternative to the result of the suit against the underwriters. In January, 1948, "Calmar" also filed suit against the United States in the Court of Claims (No. 48509), seeking to recover for substantially the same claims as those pleaded in the first libel herein. This suit is pending and undetermined.

With the issues thus framed, the suits herein proceeded to trial. After consideration of the testimony and exhibits, I make the following:

### Findings of Fact.

(1) Calmar Steamship Corporation is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at 25 Broadway, County, City and State of New York.

(2) Calmar Steamship Corporation was the owner of the S.S. Portmar during the period beginning November 21, 1941 and ending at noon, Eastern Australian Time, November 17, 1942.

(3) The S.S. Portmar was a single screw ocean cargo steamship registered under the laws of the United States, built in 1919, classified and maintained in Class A–1, Lloyd's Register of Shipping. Her tonnage was gross 5,500, net 3,418, deadweight capacity 8,600 tons. Her dimensions were length 409.8'; beam 54.2'; depth 27.7'. Her speed on a consumption of 164 barrels of fuel oil per day was in excess of 9½ knots.

(4) As of November 21, 1941 Calmar Steamship Corporation chartered the S.S. Portmar to the United States acting, pursuant to statutory authorities, by and through the United States Maritime Commission by a voyage charter on a time basis, which contained among others, the following provisions:

"Part I.

"Article 1.01. The Owner agrees to let, and the Charterer agrees to hire the Vessel, from time of delivery, for trading for one round voyage from United States Pacific Port or ports to a port or ports in the Philippine Islands, returning to U. S. North Atlantic port or ports.

"Article 1.02. The rate of hire payable as provided in Article 2.03 shall be $4.70 per ton of the Vessel's deadweight capacity as hereinbefore stated per month or pro rata for any portion thereof. The Charterer shall also pay the Owner at the rate of $1.50 per day per person for victualling of any personnel (in addition to the Vessel's normal complement) required to be aboard the vessel by written request of the Charterer of by any other agency or department of the Government, * * *

"Article 1.03. The valuation of the Vessel for insurance purposes as provided in Article 2.17 shall be $860,000.

"Article 1.04. The Vessel shall be delivered at the port of Portland, Oregon on or about November 21, 1941, and redelivered (unless lost) at a U. S. North Atlantic port, north of Cape Hatteras. * * *"

Part II.

"Article 2.01. * * * The Vessel on her delivery shall be ready to receive cargo with clean-swept holds and, as far as due diligence can make it so, tight, staunch, strong and in every way fitted for service, having water ballast, winches and power sufficient to run all the winches at one and the same time and a Master and a full com-

plement of officers and a crew for a vessel of her tonnage, and due diligence shall be exercised by the Owner to maintain her in such state during the currency of this Charter. * * *

"Article 2.03. The Charterer shall (except as otherwise specifically provided herein) pay hire for the use of the Vessel at the rate stipulated in Article 1.02, beginning with the time of her delivery, and continuing until the time of her redelivery in like good order and condition, ordinary wear and tear excepted, to the owner at the port of redelivery specified in Article 1.04, or if the Vessel shall be lost, until the time of her loss, if known, otherwise to the time last heard from; or in the case of a constructive total loss, to the time of the casualty resulting in such constructive total loss, except that where two or more successive casualties contribute to such loss, the time of the casualty last occurring shall be the time when hire ceases. Redelivery shall not be made until completion of repairs of any damage arising from causes specified in Article 2.04 (ii), and hire shall continue until completion of such repairs, except to the extent that loss of time is caused by failure of the Owner to exercise due diligence to have such repairs effected promptly and to prevent loss of time. The hire provided for in this Charter shall be due and payable on the first day of each calendar month for the preceding month or portion thereof. * * *

"Article 2.04. Payment of hire hereunder shall cease to the extent that time is lost to the Charterer:

"(a) if the Vessel is prevented, in whole or in part, from working for twenty-four consecutive hours because of a deficiency of men or stores, breakdown of machinery, collision, stranding, or fire or other accident or damage to the Vessel; * * *

* * * * * *

"*Provided,* however That, except to the extent that loss of time is caused by the failure of the Owner to exercise due diligence to keep the Vessel working and to prevent loss of time, payment of hire shall not cease because of:

* * * * * *

"(ii) the happening of any event listed in (a) above caused by the fault of the Charterer or caused or contributed to by war or warlike acts, sailing in convoy, operating (contrary to peace-time custom) without lights or pilots, navigating or mooring in (contrary to peace-time custom) unlighted, unbuoyed, or overcrowded waters, excessive usage (because of war or warlike conditions) of machinery or equipment, navigating (contrary to peace-time custom) under the direction of naval, military, Coast Guard, or other governmental authorities, or discharging alongside or into ships; * * *

"Credit shall be given to the Charterer for expenses save by the Owner during any loss of time as to which no cessation of hire is provided for.

* * * * * *

"Article 2.05. The Owner shall provide and pay for: all provisions; all galley, cabin, deck and engine room stores; fuel for cooking; wages of, and consular, shipping and discharging fees and other expenses pertaining to, the Master, Officers and Crew (except as herein otherwise provided); 25% of all fresh water used by the Vessel if a steamer, or 75% if a motorship, all water ballast; and insurance (except as herein otherwise provided) on the Vessel."

"Article 2.11. * * * The Master (although appointed by the Owner) shall be under the orders and directions of the Charterer as regards employment, agency, and prosecution of the voyages; * * *

"The charterer shall indemnify and hold harmless the Owner, the Master and the Vessel from all consequences and liabilities whatsoever arising from compliance with any orders or directions of the Charterer or its agents, given pursuant to this Article or any other Article of this Charter."

"Article 2.16. * . * * And neither the Vessel, her Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from: act of God, act of war; act of public enemies, pirates, or assailing thieves;

arrest or restraint of princes, * * *. No exemption afforded to the Charterer under this Article shall diminish its obligations for hire under the other provisions of this Charter.

"Article 2.17. The Owner may provide, and the Charterer shall pay for, or, if the Charterer shall so elect and give notice of such election to the Owner at or prior to the date of delivery of the Vessel with respect to the first voyage, or at or prior to the time when loading commences at the first port of loading with respect to any subsequent voyage during the charter period, the Charterer shall provide and pay for or assume: (i) insurance on the Vessel, which shall be made payable to the owner, in the amount specified in Article 1.03, under full form of American Institute of Marine Underwriters' war risk policies, including malicious damage, sabotage, strikes, riots and civil commotion valued at the amount insured: (ii) all war risk insurance, as required, on the lives of or for injuries to officers and crew and loss of or damage to their personal effects, including sextants of deck officers, or leased equipment aboard for which the Owner is responsible, and on slop chests; and (iii) war risk protection and indemnity insurance, for the benefit of the Owner and the Charterer as their interests may appear, including Owner's liabilities to officers and crew until repatriated.

"The Vessel shall not be required to sail on any voyage until the insurance contemplated by this Article has been placed by the Owner or provided or assumed by the Charterer, as the case may be, provided, however, that written or telegraphic notice of assumption by the Charterer shall be sufficient.

\*　·　\*　　\*　　\*　　\*　　\*

"Article 2.21. Nothing herein stated is to be construed as a demise of the Vessel to the Charterer.

\*　　\*　　\*　　\*　　\*　　\*

"Article 2.27. The Master and the Vessel shall have liberty to comply with any orders of directions as to loading, departure, arrival, routes, ports of call, stoppages, discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having, under the terms of the war risk insurance on the ship, the right to give such orders or directions, and if by reason of or in compliance with any such orders or directions anything is done or is not done, such shall not be deemed a deviation or breach of orders or neglect of duty by the Master or the Vessel; *provided, however,* that whenever any such orders or directions given otherwise than by the Government of the United States or its representative are contrary to sailing directions or other orders of the Charterer as to the employment of the Vessel hereunder, the Master shall, if practicable, apply to the Charterer or its agents or to a representative of the Government of the United States for consent or advice and shall not comply with such orders or directions unless such consent or advice to comply is first obtained; provided further, however, that if it is impracticable in any case to act in accordance with the foregoing proviso, the Master's decision as to compliance with any such orders or directions shall be made with due regard to the interests of all concerned, including the Charterer, the Owner, the Vessel, her crew and cargo."

(5) Pursuant to the provisions of Article 2.17 of said Charter, Calmar Steamship Corporation took out war risk insurance under full form of American Institute of Marine Underwriters' war risk policies, including malicious damage, sabotage, strikes, riots and civil commotion, in the hull and machinery of S.S. Portmar valued at $860,-000. Said insurance was arranged through its brokers, Mather and Company, Philadelphia, and their London correspondent, Thomas Stephens & Sons, Ltd.

(6) Slips binding said war risk insurance were submitted to the various underwriters representing members of syndicates of Lloyds, London, and to members of the Institute of London Underwriters, and to the Excess Insurance Company, Ltd., all of whom initialed the slips with notation

as to amounts of portions of the risk subscribed.

(7) Said slips contained among others the following provisions:

"U. S. Dollar A/C
"Portmar /S/
"U. S. Pacific to at and from Philippines and return to U. S. Pacific &/or Atlantic port or ports and 15 days
via port or ports in any order
HULL & MACHINERY valued $860,000.

"Against war, s.r. & c.c. and m.d. American Clauses N. Y. S. Cl. Undrs. pay tax."

Said slips were initialed by said underwriters on November 26 and 27, 1941.

(8) Prior to November 26, 1941, negotiations between the Secretary of State, Hon. Cordell Hull, and Japanese envoys, Admiral Kichisaburo Normura, and M. Saburo Kurusu, approached a critical stage. The daily press carried news items of increasing tension in the Pacific situation. The possibility of war with Japan was openly recognized and provoked much discussion in American and British official circles. The British Prime Minister had discussed the extent of British naval participation in the Pacific in the event of war with Japan. It was generally expected that danger might develop at any moment in the Far East.

(9) Mather & Company sent to Thomas Stephens & Sons, Ltd. printed forms of marine hull insurance in the form "American Institute Time (Hulls) (July 1, 1941)" and War Risk Clauses and riders to be attached thereto in the form published by the American Institute of Marine Underwriters, after adoption and promulgation by the American Marine Insurance Syndicate.

(10) On January 19, 1942, Sydney Keith Scott and other underwriting members of Lloyds, London, respondents herein, issued a policy of war risk insurance on said forms, insuring Calmar Steamship Corporation in the total sum of $714,000 on the hull and machinery of S.S. Portmar valued at $860,000, at and from a United States Pacific port to port or ports in the Philippine Islands whilst there and return to United States Pacific port or United States Atlantic port (via Panama Canal) via port or ports any order and for twenty-four hours after arrival.

(11) On January 19, 1942 Edinburgh Assurance Co., Ltd., Northern Maritime Insurance Co., Ltd., Fine Art & General Insurance Co., Ltd., British Law Insurance Co., Ltd., Planet Insurance Co., Ltd., Elders Insurance Co., Ltd., and National Provincial Insurance Co., Ltd., as members of the Institute of London Underwriters issued a policy of war risk insurance on said forms, insuring Calmar Steamship Corporation in the total sum of $116,000 on war risk insurance on the hull and machinery of S.S. Portmar valued at $860,000 at and from a United States Pacific port to port or ports in the Philippine Islands whilst there and return to United States Pacific port or United States Atlantic port (via Panama Canal) via port or ports any order and for twenty-four hours after arrival.

(12) On January 19, 1942, Excess Insurance Company, Ltd., issued a policy of war risk insurance on said forms insuring Calmar Steamship Corporation in the sum of $30,000 on the hull and machinery of S.S. Portmar valued at $860,000, at and from a United States Pacific port to port or ports in the Philippine Islands whilst there and return to United States Pacific port or United States Atlantic port (via Panama Canal) via port or ports of any order and for twenty-four hours after arrival.

(13) Libelant duly paid to respondents the issuing premiums required by said policies.

(14) The said policies contained among others the following provisions:

"Only against the risks of war, strikes, riots and civil commotions as per American form attached."

"Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Enemies, * * * and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof; excepting, however, such of the fore-

going Perils as may be excluded by provisions elsewhere in the Policy or by endorsement. And in case of any loss or Misfortune it shall be lawful for the Assured, their Factors, Servants and Assigns to sue, labor and travel for, in, and about the Defense, Safeguard and Recovery of said Vessel, &c., or any part thereof, without prejudice to this Insurance, to the Charges, whereof the Underwriters will contribute their proportion as provided below. And it is expressly declared and agreed that no acts of the Underwriters or Assureds, in recovering, saving or preserving the property insured shall be considered as a waiver or acceptance of abandonment.

\* \* \* \* \* \*

"Notwithstanding anything herein contained to the contrary, this Policy is warranted free from Particular Average under 3 percent., or unless amounting to $4,850, but nevertheless when the Vessel shall have been stranded, sunk, on fire, or in collision with any other ship or Vessel, Underwriters shall pay the damage occasioned thereby, and the expense of sighting the bottom after stranding shall be paid, if reasonably incurred, even if no damage be found.

\* \* \* \* \* \*

"No recovery for a Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the Vessel shall exceed the insured value.

"In ascertaining whether the Vessel is a Constructive Total Loss the insured value shall be taken as the repaired value, and nothing in respect of the damaged break-up value of the Vessel or wreck shall be taken into account.

\* \* \* \* \*

"F. C. & S. Clause.

"Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt thereat, or any taking of the Vessel by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or war-like operations (whether there be a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom.

"If war risks are hereafter insured by endorsement on the Policy, such endorsement shall supersede the above warranty only to the extent that their terms are inconsistent and only while such war risk endorsement remains in force.

\* \* \* \* \* \*

"War Risk Clauses.

"It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty.

"This insurance is also subject, however, to the following warranties and additional clauses:

"The Adventures and Perils Clause shall be construed as including the risks of piracy, civil war, revolution, rebellion or insurrections or civil strife arising there from, floating and/or stationary mines and/or torpedoes whether derelict or not and/or military or naval aircraft and/or other engines of war including missiles from the land, and warlike operations and the enforcement of sanctions by members of the League of Nations, whether before or after declaration of war and whether by a belligerent or otherwise, but excluding arrest, restraint or detainment under customs or quarantine regulations, and similar arrests, restraints or detainments not arising from actual or impending hostilities or sanctions.

"The Franchise warranty in the attached policy is waived and average shall be payable irrespective of percentage and without deduction of new for old. The provisions of the attached policy with respect to constructive total loss shall apply only to claims arising from physical damage to the insured vessel.

\* \* \* \* \* \*

"Held covered in the event of any breach of warranty as to date of sailing or deviation or change of voyage, provided prompt

notice be given these Insurers when such facts are known to the Assured and/or their managers and an additional premium paid if required." F–300.

"Notwithstanding anything to the contrary contained in this policy, it is understood and agreed that this insurance is warranted free of claims arising from Capture, Seizure, Arrest, Restraint, Detainment, Requisition, Nationalization or Condemnation by or under the authority of the government of Great Britain or any of its dominions, colonies, possessions or allies, or by any forces acting in co-operation with or under the control of them or any of them; but unless the insured Vessel is condemned this warranty shall not exclude losses otherwise covered by this policy which are caused by gunfire, torpedoes, bombs, mines or other implements of war, or by stranding, sinking, burning or collision, provided such losses would not be covered by a marine insurance policy (in the form hereto attached) warranted free of claims arising from Capture, Seizure, or Detention. B. C. 2."

(15) Calmar Steamship Corporation by letter of November 26, 1941, informed the United States Maritime Commission of the kind and amount of insurance that it had taken for this voyage.

(16) The said policies of insurance were approved by the United States Maritime Commission, and were in accordance with Article 2.17 of said charter.

(17) During the period beginning November 21, 1941 and ending November 17, 1942, the Master of the Portmar was Axel Michelson, a duly licensed and competent master mariner, employed by Calmar Steamship Corporation, and who had been in the employ of Calmar since 1927.

(18) Pursuant to said charter, on November 23, 1941, high octane gasoline in drums was loaded on the Portmar at Oakland, California, and military equipment, supplies and ammunition were subsequently loaded at San Francisco, California.

(19) Prior to sailing on the voyage the Master received secret written and oral orders from the U. S. Naval Control officer in San Francisco, 12th Naval District, imposing radio silence shortly after leaving San Francisco, and stating the following successive positions to be passed through by the Portmar on the outward voyage from San Francisco to Manila, Philippine Islands: (1) Lat. 37° 45′ N; Long. 122° 41′ W.; (2) Lat. 32° 30′ N; Long. 129° 30′ W; (3) Lat. 22° 50′ N; Long. 140° 00′ W; (4) Lat. 13° 50′ N; Long. 149° 40′ W; (5) Lat. 3° 45′ N; Long. 160° 00′ W; (6) Lat. 6° 00′ S; Long. 170° 45′ W; (7) Lat. 11° 50′ S; Long. 180° 00′; (8) Lat. 12° 50′ S; Long. 166° 30′ E; (9) Lat. 15° 25′ S; Long. 157° 30′ E; (10) Lat. 12° 10′ S; Long. 148° 10′ E; (11) Lat. 5° 35′ S; Long. 130° 00′ E; (12) Lat. 6° 00′ N; Long. 123° 05′ E, to destination.

(20) The routing orders thus given the Portmar were given by the United States as sovereign and not as charterer, and were such as were customarily issued during this period to those in charge of American flag, cargo vessels regardless of ownership or charter arrangements. The prescribed course did not follow the usual and customary commercial lanes travelled in normal times between San Francisco and the Philippines.

(21) The Master did not inform Calmar Steamship Corporation of the points stated in the said Naval Orders, and Calmar did not know the route thus prescribed.

(22) On November 28, 1941, the Portmar, fully manned, equipped, supplied and seaworthy in all respects, sailed from San Francisco pursuant to said charter and followed the course prescribed in the Naval Orders.

(23) At the time the Portmar sailed there were three U. S. Army Sergeants on board as supercargoes, one of whom had a complete manifest of all cargo on board.

(24) On December 7, 1941, the Japanese attacked Pearl Harbor.

(25) On December 7, 1941, at about 8 a. m. the Master of the Portmar heard a radio report of the Japanese attack on Pearl Harbor. The Portmar was then at about Lat. 15° 0′ N; Long. 149° 0′ W, about 600 miles south east of Hawaiian Islands.

(26) The U. S. Naval routing orders required the Portmar to pass between or near

Fanning and Christmas Islands. The Master knew of cable landings on those islands, and feared that he could not pass said islands by night or day without being observed, attacked and possibly captured by the Japanese. Properly, for the safety of his vessel, he put the Portmar on a southerly course to avoid all the islands until further naval orders were received.

(27) On December 8, 1941, the United States and Great Britain declared war against the Japanese Empire.

(28) On December 9, 1941 H.M.S. Prince of Wales and H.M.S. Repulse were destroyed by Japanese aircraft off the east coast of the Malay Peninsula. The loss of these two ships together with United States losses at Pearl Harbor gave the Japanese full battle fleet command of the Pacific. The Japanese then had naval superiority which enabled them to transport troops to almost any desired point, possess themselves of it, and establish it for an air-naval fueling base.

(29) On December 11, 1941 when the Portmar was at about Lat. 2° 0′ S; Long. 148° 0′ W, the Master received an order by radio from the Commandant of the 12th U. S. Naval District, San Francisco, ordering the Portmar and three other vessels to proceed to Suva, Fiji Islands, and there receive further instructions from the British Naval Authorities. The Portmar in compliance changed course toward Suva.

(30) The Portmar arrived at Suva on December 20, 1941, and a British Naval Control Officer, Commander Gray, accompanied by a United States naval officer, also named Commander Gray, came on board the vessel. British Commander Gray gave the Master written and oral orders to proceed to Sydney, Australia. In answer to the Master's questions as to taking orders from the British Naval Control officer, Commander Gray, U. S. N., told him that it was with the absolute knowledge and understanding of the United States authorities and that he should comply.

(31) At Suva, Captain Michelson tried to send a cable message to Calmar Steamship Corporation but was informed that it could not be done for security reasons. He thereupon wrote two letters to Calmar Steamship Corporation, in one of which he informed them of the foregoing events, and left the letters with one of said naval officers to be mailed.

(32) Calmar Steamship Corporation never received these letters written by the Master at Suva.

(33) From the time the Portmar left Suva for Sydney, Australia, until the damage later sustained by enemy attack on February 19, 1942, every movement of the Portmar was directed by and in accordance with orders of the military authorities, either of the United States or of the Australian Government. All of these orders were given by these allied governments as sovereigns engaged in war and for military reasons, as well as to provide for the greater safety of the vessel.

(34) The Portmar sailed from Suva on December 22, 1941, and arrived at Sydney, Australia, on December 30, 1941. Captain Michelson there reported to the Australian Naval Control officer.

(35) The Master, through his agents at Sydney, Australia, Dalgety & Company, and the United States Consul, tried to send a cable message to Calmar Steamship Corporation, but was told that it could not be done for security reasons.

(36) At Sydney, the Master received written and oral orders from the Australian Naval Control officer requiring the Portmar to proceed to Brisbane, Australia and there report to the Australian Naval Control officer.

(37) At Sydney, the Master inquired of the United States Consul whether it was with their knowledge and approval that he should take orders from the Australian Naval Control and was told by the consul that he was obliged to follow such orders.

(38) The Portmar sailed from Sydney on January 2, 1942 and arrived at Brisbane on January 5, 1942. The Master reported to the Australian Naval Control officer at Brisbane.

(39) The Master attempted through his agents, at Brisbane, Dalgety & Company, and through the United States consul there to send a cable message to his owners, but was informed it could not be done.

(40) In response to the Master's inquiry, the American consul at Brisbane told him that he should continue to follow the orders of the Australian military authorities, as it was witn the full knowledge of the American authorities.

(41) The United States military authorities at Brisbane gave orders that the cargo on the Portmar was to be discharged, sorted and part of it reloaded, together with other cargo, and employed Australian stevedores to do this work. The Australian Naval Control officer at Brisbane thereupon ordered the Portmar to proceed to Port Darwin. Pursuant to these orders, the Portmar sailed from Brisbane on January 9, 1942.

(42) While proceeding to Port Darwin according to orders, on January 15, 1942, the Master was ordered by signal to go into the harbor at Thursday Island, Torres Strait. The Australian Naval Control officer there ordered the Portmar to proceed to Darwin with two other American ships in convoy of two Australian corvettes. The Portmar arrived at Port Darwin on January 19, 1942.

(43) From the time the vessel sailed from San Francisco until January 19, 1942, Calmar Steamship Corporation had not received any information as to the Portmar.

(44) On January 19, 1942, Calmar Steamship Corporation received unofficial information from Mr. Freeze of the United States Lines, who stated that the United States Lines was to be the homeward agent on the charter and that the Portmar was somewhere in Australia.

(45) On January 22, 1942, Calmar Steamship Corporation received a teletype message from its San Francisco office stating that the Portmar was in Australia. On January 24, 1942, Calmar Steamship Corporation assuming that the Portmar had gone to Australia under government orders, notified the war risk underwriters that the Portmar had been diverted to Australia on outward voyage under Government orders and requested that the vessel be held covered pending further advices. All the underwriters agreed, and this was confirmed by letter from Thomas Stephens & Sons, Ltd., of February 6, 1942 to Mather & Company, reading: "We have your cable of the 24th January last advising that this vessel insured for the voyages from U. S. Pacific ports to the Philippines and return to U. S. has been diverted to Australia on the outward voyage under Government orders. We confirm that all Underwriters on our War Risk Policy have agreed to hold this diversion covered pending your further advices."

(46) On January 19, 1942, the Master reported to the Australia Naval Control officer at Port Darwin. The United States Army authorities at Port Darwin ordered the Master to discharge the cargo from the Portmar as soon as a berth was available. The Portmar lay at anchor in Darwin Harbor until she docked at Port Darwin on January 31, 1942. The cargo was discharged, except 1500 drums of gasoline which the American military authorities ordered the Master to retain on board. The Portmar was thereupon ordered to reload 500 drums of gasoline, previously discharged, to make the amount on board 2,000 drums.

(47) The Master again attempted to send a cable message to Calmar Steamship Corporation, but was told that it was absolutely impossible, that the land lines from Darwin to Melbourne were inadequate to carry half the necessary military messages and furthermore that it could not be done for security reasons.

(48) On or about February 4, 1942, Captain Michelson received written and oral orders from the Australian Naval Control Officer at Darwin to proceed to Wyndham, Australia, discharge the gasoline and return to Port Darwin. The Master told the United States Naval Observer at Port Darwin, Commander Collins, that he objected to being ordered about by foreign naval authorities but was instructed that it was necessary to follow such orders because of the necessity of co-operating in a desperate situation.

(49) Pursuant to orders of the Australian Naval Control the Portmar sailed in convoy of an Australian corvette from Port Darwin on February 4, 1942, and arrived at Wyndham on February 8, 1942. The gasoline was discharged pursuant to arrangements made by American Army au-

thorities. The Portmar sailed from Wyndham on February 10, 1942 and arrived again and anchored at Port Darwin on February 12, 1942.

(50) Pursuant to orders of the Australian Naval Control officer, the Master berthed the Portmar on February 13, 1942. Thereupon, on February 13 and 14, 1942, the Master of the Portmar was ordered by the U. S. Army Commander to discharge all dunnage and take on board a detachment of three to four hundred officers and men of the 148th Field Artillery, with their field guns, military stores, supplies, equipment and ammunition, and a motor launch, the Nevbet, belonging to the Australian Army.

(51) The Island of Timor was then in the hands of the allies of the United States. Japanese troops did not land on Timor until March 1, 1942.

(52) On the night of February 14, 1942, the Master was ordered by the Australian Naval Control officer to report on board the cruiser U.S.S. Houston. The Master obeyed this order, and there met, at a convoy conference the master of three other merchant vessels, Captain A. H. Rooks, commanding officer of the Houston, and the commanders of other naval vessels.

(53) At the convoy conference the Master was handed orders by the Australian Naval Control officer which were explained by Captain Rooks, to the effect that the Portmar and the three other merchant vessels were to proceed for Koepang, Timor, in convoy of the Houston, the United States Destroyers Preston and Perry and four Australian corvettes; that it would be a very dangerous mission, that Koepang Harbor was going to be a "hot place", that he would escort the convoy up to the entrance but not into the harbor. Prior to this time, the Master had heard that an "Empire Airways" flying boat had been destroyed by enemy action en route between Darwin and Koepang on January 29, 1942; and it was then generally known in Darwin that on February 13, 1942 the port of Koepang had been bombed by the Japanese. Pursuant to these orders the Portmar sailed in convoy from Port Darwin at 1:30 a. m. on February 15, 1942, carrying men and matériel to aid in the defense of Koepang.

(54) On February 15, 1942 while steaming across the Timor Sea the convoy was attacked by two Japanese planes and was ordered to disperse. Bombs dropped by those planes did not fall near the Portmar. Shortly thereafter the convoy was ordered to reassemble and continue toward Koepang.

(55) On the morning of February 16, 1942 while steaming across the Timor Sea the convoy was attacked by a squadron of Japanese bombers. This attack lasted about forty-five minutes; many bombs were dropped near the Portmar, and she was severely shaken. After the attack, the Master received reports from the Chief Mate and Chief Engineer that the bombing had shaken paint and scale loose from the frames of the vessel, had unsettled parts of the machinery and fractured certain bilge lines. The Master observed that the vibrations of the vessel under way had somewhat changed.

(56) The point at which the convoy was attacked was about 250 miles from the route along which the Portmar had been directed to proceed by the instructions issued to her Master by the United States Navy in San Francisco.

(57) There is no evidence that the danger of attack by Japanese planes at the point where the Portmar's convoy was bombed was then any greater or less than the danger of such attack along the route originally assigned the Portmar by the United States Navy when she sailed from San Francisco.

(58) After the enemy attack of February 16, 1942 the convoy was ordered by the Commanding Officer of the U.S.S. Houston to return to Port Darwin. The Portmar arrived again at Port Darwin and anchored there at 12:55 p. m. on February 18, 1942 at a position designated by the Australian Naval Control Officer. She was ordered to await her turn at a specified discharging berth, and upon reaching her turn, to dock and discharge her military supplies, equipment and personnel.

(59) Later the Australian Naval Control officer gave orders that the Portmar was to be docked the next day, February 19, 1942, but that order was countermanded early the next morning. The Portmar remained at anchor.

(60) On February 19, 1942, at about 9:55 a. m., Japanese airplanes attacked the vessels in the harbor at Port Darwin. As a result of this attack, in addition to damage to the Portmar and other disasters, S.S. Neptune, the destroyers U.S.S. Perry and U.S.S. Preston and a British motor ship were destroyed.

(61) When the attack began the Master ordered the life boats swung out and lowered to the main or weather deck level. The Japanese planes attacked the Portmar with bombs and gunfire as she lay at anchor. Two bombs were dropped close to the port side of the Portmar. The first bomb went through the aft life boat on the port side, completely destroying it. The bomb exploded within twelve feet of the port side of the vessel in the vicinity of the engine room, and split the forward life boat in two parts. The second bomb was dropped and exploded within fifty feet of the port side of the vessel.

(62) At the same time the vessel was subject to continuous machine gun and aerial cannon fire by Japanese fighter planes. One of the crew was killed and several of the crew and military personnel were seriously wounded.

(63) As a result of said air attack the vessel sustained severe and extensive damage; the port side was perforated with holes above and below the water line; three of the cargo booms fell as the rigging was shot away; the decks were penetrated fore and aft; the accommodations were blasted and wrecked; the ship began to take water in the No. 4 and 5 holds through the holes near or below the water line; fire broke out in the munitions in No. 4 hold; the Master decided to beach the vessel, if possible, before she sank in the harbor.

(64) The vessel weighed anchor with difficulty due to punctures in the steam lines. Japanese aircraft continued their attacks. The engine room telegraph, the standard compass and the steering compass were demolished. The Second Officer was shot down as he stood at the engine telegraph on the bridge.

(65) The Portmar, navigated by the Master, proceeded to the southerly part of the harbor, anchored at 1:05 p. m. on February 19, 1942 off Channel Island, at which time the Master ordered the military personnel disembarked by the Australian corvette Vigilante and the launch Nevbet. Due to the damage to the bilge lines, sea water which entered the leaking hull could not be pumped out. As more water entered the list of the vessel to port increased. She was unable to handle her anchors or to manoeuvre to avoid attack in the event of another air raid. After she succeeded in disembarking her military personnel, her Master beached her.

(66) The Master directed the Portmar toward a cove on the eastern shore of the harbor. With no compasses and navigated by lead line and visual observation of the shoals, the Portmar grounded on her starboard side from about midships to aft at 2:12 p. m. at lat. 12° 34' S; long. 130° 52' E at a point about six miles south of the town of Darwin. The mean draft of the vessel at that time was 12.11 feet.

(67) The tidal range at the point where the Portmar lay on the beach was about 27 feet. At low water the Portmar was submerged from the aft end of the ship to the aft end of midship house; at high water the water was over the poop and forward into the shelter deck.

(68) The list of the vessel to port increased with the ebb of the tide and more holes were put below water. Between 4:00 p. m. and 5:00 p. m. on February 19, 1942, the Chief Engineer reported to the Master that he could not control the entry of water and that the boilers might blow up as the list increased. When the list increased to about 40°, the Master feared, and justifiably so, that the vessel would turn over and the boilers would explode. He personally dropped the port anchor to hold the vessel in position and ordered the crew off the vessel. They were taken off by the Australian corvette Vigilante.

(69) The Master ordered the Chief Officer and Chief Engineer to keep the crew together, to go to Darwin and get in touch with the American military authorities and see that the crew were taken care of. The Master and three members of the crew whom the Master asked to stay with him, went aboard the launch Nevbet and moved a short distance away from the ship because it was feared that she would turn over, and also because of fear of further attack by Japanese aircraft.

(70) After dark and the beginning of the flood tide the list of the ship decreased somewhat. The Master went on board the ship again with two of the men and remained most of the night. On February 20, 1942, when daylight came, the men would not stay aboard the ship because of fear of further attack by Japanese aircraft. There was no drinking water nor water for sanitary purposes, and neither steam nor electricity. The Master went with the men to the shore a little to the South of Channel Islands and hid in the mangroves. From that point the Master saw Japanese aircraft bombing the town of Darwin and the area to the south. The Master returned to the vessel several times during the day and inspected the condition of the vessel. He remained on board the night of February 20–21, 1942 and all during daylight on February 21st.

(71) Late in the afternoon of February 21st at about 4.05 p. m., the Master left the vessel in the launch and went ashore to get drinking water. Before leaving the vessel on that occasion he lowered the starboard anchor personally in order to prevent the vessel from getting into a worse position in the event of a cyclone, which might reasonably be expected at that time of the year. While the Master was ashore near the Channel Islands, a launch came down the harbor carrying the chief mate, Colonel Petterson, the commanding officer of the 148th Field Artillery Regiment, United States Army, and Captain John Prothero Williams, a professional salvor, who was also connected with and later employed by the Australian Commonwealth Salvage Board.

(72) The field guns in the holds of the Portmar were urgently needed by the United States Army, and Col. Petterson wanted to see if the guns could be salvaged. The guns were under water as the ship then lay. Col. Petterson and Capt. Williams examined the vessel with Captain Michelson for the purpose of ascertaining where and how the artillery was stowed and considering the means of salvaging it. Nothing was said and no discussion was had of the possibility of salving the vessel.

(73) After this examination of the vessel on the evening of February 21, 1942, Captain Michelson went ashore with Col. Petterson, and Capt. Williams remained aboard the ship waiting for an Australian corvette to take him ashore. Capt. Michelson took the ship's secret documents with him and turned them in to the Australian Naval Control officer in Darwin, taking a receipt for them.

(74) The Master tried to find a public official before whom he could note a protest but was unable to find any at Darwin. The Master then went by military truck to a United States Army camp about twenty miles south of Darwin and there reported to the commanding officer Col. La Rue. At this camp, on the evening of February 21, 1942 Capt. Michelson endeavored to send a cable message to Calmar Steamship Corporation but was unable to do so. He remained there overnight. On February 22, 1942, with the chief officer, Mr. Bullock, the Master returned to the Portmar in order to save as much of the ship's provisions as possible in order to feed the officers and crew at the camp. The Master remained on board the Portmar during the night of February 22–23 while a launch was taking the provisions from the Portmar to shore. The Master also remained on board on the following night.

(75) During daylight hours while the Master was at or near the Portmar, he saw Japanese aircraft attack Darwin and the harbor practically every day. No bombs fell near the Portmar.

(76) As the Portmar lay aground on the starboard side, the rise of the tide caused her bow to lift and the ebb of the tide

caused her bow to fall again. The Master properly considered that this inflicted severe strain twice each day on the hull of the ship.

(77) On February 23, 1942 the Prime Minister of Australia refused to consent to the diversion to the defense of Burma of a homeward-bound Australian division.

(78) A Japanese invasion of Northern Australia was momentarily expected. The American troops in that area had but few supplies and equipment and were short of ammunition. The commanding officer of one of the American regiments told Capt. Michelson that "every vehicle in my outfit is turned south and ready to go the minute the Japs come." All the civilian shops had been closed and civilians evacuated. The only authority then in Darwin was the Allied Military authority.

(79) A series of disastrous reverses suffered by the Allies (ABDA) in Malaya, both on land and sea, led to the fall of Singapore on February 15, 1942. This was followed by the Battle of the Java Sea and Sunda Strait with the loss of U.S.S. Housston and other Allied naval vessels, and the loss of the aircraft carrier U.S.S. Langley, destroyed by Japanese aircraft between Australia and Java, February 27–March 1, 1942.

(80) On March 1, 1942 the Japanese invaded the Island of Java and occupied the western part of the Island of Timor.

(81) On February 24, 1942 the Master returned to the military camp and thereafter, he, the officers and crew of the Portmar were used by the American military authorities to unload drums of gasoline from a vessel called the Admiral Halstead. The discharge of gasoline was done only at night. The Admiral Halstead was kept at anchor in the daytime and brought into the dock at night.

(82) During the interval between February 24, 1942 and March 2, 1942, Capt. Michelson returned frequently to the Portmar. He applied to the Australian Naval Control at Darwin for a watchman to prevent looting of the vessel. He examined the ship on each occasion he went aboard and found Capt. Williams making prepara-

tion for removal of the guns from the vessel. He did not observe Capt. Williams doing anything toward salvage of the vessel itself. No watchmen were posted on the Portmar while she lay on the beach because none could be secured by Capt. Michelson. The position of the Portmar as of March 2, 1942 was about the same as it was when the Master left her on the night of February 24, 1942. Capt. Michelson returned to the vessel on March 3, 1942 and left her on the evening of March 3, 1942. He never saw the Portmar again at Darwin. Between March 3rd and 10th, the Captain and the crew were confined by the military in the camp of the 147th Field Artillery, because of a dispute as to whether or not the officers and crew of the Portmar were to continue to be used for further stevedoring work in the harbor, while they contended that troops and Australian stevedores were available for such work.

(83) While under arrest in camp, the Captain made an effort to obtain transportation for himself, his officers and crew to Adelaide in order to get in touch with the owner of the Portmar and report on the events that had occurred.

(84) The judgment of the Master of the Portmar on leaving the ship for the last time on March 3, 1942 was that salving the ship, repairing her and restoring her to her former condition was then impossible because of her condition and the general situation. There were no facilities—no ships, no mechanics and no material of any kind available at Darwin for raising, towing or repairing her; there was not a pump in Darwin with which to raise the vessel and no power to run one. Before anything could be done to repair her, she had to be moved from Darwin, two thousand miles to the nearest port; the nearest dry dock large enough to handle the Portmar was at Sydney. She had to be towed through waters dominated by the Japanese; after arrival in any port of Australia with facilities they would not be adequate to restore her to pre-disaster condition. There were other wrecks that had gone without assistance. No facilities were available in all Australia for raising or towing her to anyone except military au-

thorities. Japanese continued to be expected every day. The Master's judgment was that is was highly probable that the cost of recovering and repairing the Portmar, if at any time this could be undertaken and accomplished, would exceed the value of the ship. His opinion on March 3, 1942 remained unchanged on March 10 and continued the same on April 8, 1942.

(85) The condition of the Portmar, as she lay on the beach when the Master last saw her on March 3, 1942, was one of widespread and general damage by bombs and aerial gunfire. The sea was running in and out of her, carrying mud, muck and fuel oil through holes in the hull; she was almost full of water in No. 4 and 5 holds, the engine room, boiler room, shelter deck and poop; the piping in the engine room and holds was shattered and bare of covering; the boilers had been shifted in their saddles and the auxiliaries had shifted in their foundations; all quarters and accommodations were demolished and shattered; the woodwork and fittings in No. 4 and 5 holds were damaged; the standing and running rigging and most of the booms were damaged and had fallen to the decks; the navigating equipment of the ship was damaged or destroyed; the ice machine and all refrigerating machinery was damaged; the decks, steam piping, smokestacks, ventilators, engine room, fire room and skylight were shattered and perforated from fore to aft; the radio house was blown off its foundation and all the instruments were damaged or destroyed; the telemotor piping and the steering controls were perforated; the lifeboats had been destroyed; and, the electric wiring in the ship had been generally damaged and broken by the effect of bomb concussion in the quarters.

(86) The Chief Officer of the Portmar, who also held a master's license, confirmed the judgment of Capt. Michelson that it was highly probable that the cost of recovering and repairing the vessel would exceed her value when repaired. In the judgment of Chief Officer Bullock, the situation of the Portmar was hopeless as to salvage, repair and reconditioning.

(87) The military situation as of March 3rd and 10th, 1942, was that the United States Navy had abandoned Port Darwin and moved to the Exmouth Gulf, fifteen hundred miles to the southwest of Darwin. There was a small detachment, about fifty American soldiers on the Cape York Peninsula which had been otherwise completely evacuated down to Brisbane. A Japanese invasion of northern Australia was constantly threatened. A defense line had been set up fifteen miles north of Melbourne on the south coast. The Japanese held the Tanimbar Islands only three hundred miles away. Japanese surface craft and submarines controlled the seas, and the Japanese air force dominated the air. The situation of peril which had existed since December 9, 1941 was daily increasing.

(88) On March 10, 1942, the master, officers and crew of the Portmar were put on a train at Darwin; they were escorted to the train by an armed, military guard.

(89) The route to Melbourne from Darwin was by a narrow gauge railroad about 250 miles from Darwin to Birdum, thence by truck about 500 miles across the desert to Alice Springs, thence by railroad about 1500 miles via Adelaide to Melbourne.

(90) During the railroad trip between Alice Springs and Adelaide, Chief Officer Bullock saw a gondola car on a siding with large centrifugal internal combustion engine driven pumps in it. The gondola car was in a train bound the other way. He went over to the car and examined the pumps and found that they were addressed to Captain Williams at Darwin. Chief Officer Bullock told Capt. Michelson about these pumps. They were the pumps later used by Capt. Williams in pumping out the Portmar. They were obtained by the Australian government and sent to Capt. Williams from South Australia, 2,000 miles overland at government direction and expense. No private, individual shipowner could have obtained them or any other salvage equipment or facilities. No commercial arrangements for the towage to Brisbane could have been made.

(91) Up to the time of departure from Darwin, the Master of the Portmar had

not been able to send any word to Calmar Steamship Corporation. When he boarded the train at Darwin on March 10, 1942, he planned to get in touch with Calmar as quickly as possible to advise it fully of what had happened and to request and carry out its instructions.

(92) On March 22, 1942, the Master, officers and crew of the Portmar arrived at Melbourne. The master noted protest and extended his protest both before a notary public and the American consul.

(93) The master employed Malleson Stewart & Co., Solicitors, of Melbourne, to represent and protect the interests of the vessel and her owner, Calmar Steamship Corporation.

(94) The officers and crew were repatriated from Melbourne on or before April 17, 1942. The Master remained in Australia and endeavored by all possible means to return to Darwin, and failing in this, to get information as to the situation of the Portmar and what was being done with her.

(95) The first salvage operations of Capt. Williams were directed toward the saving of the field guns.

(96) While working on the salvage of the artillery on the vessel, he found the ship less badly damaged than he had thought and that the vessel might be floated. Late in March or in early April Colonel Plant of the United States Army Transport Service ordered Capt. Williams to endeavor to float the vessel. By temporary patching of the shrapnel holes at low water, and utilizing the pumps and by repeating that process on successive tides, he finally got the ship free of water and kept it so with the pumps. The vessel was pumped out, by means of the pumps sent to Darwin by the Australian government, and floated on April 5, 1942. Capt. Michelson first learned that the vessel was afloat on April 13, 1942.

(97) The fact that the vessel was afloat at Port Darwin did not change the master's judgment as to the hopeless situation of the vessel.

(98) On February 23, 1942 Calmar Steamship Corporation received a telegram from War Shipping Administration advising that the Portmar was reported to have been badly damaged in an air raid at Port Darwin, extent of damage unknown. On March 24, 1942, Calmar Steamship Corporation received the following cable message from the master of the Portmar: "Ship accessible half length at low tide my opinion excessive damage makes salvage impossible stop have you any instructions I should follow to protect owners interests"

(99) On March 30, 1942, Malleson Stewart & Co., libelant's solicitors at Melbourne, sent Calmar the following cable message: "Consulted by Michelson ship foundered stop accessible half length at low tide but Michelson considers constructive total loss stop recommend tender abandonment stop Michelson just arrived and protest noted stop delayed arrival and protest completely justified stop apply navy further particulars stop acknowledge"

(100) On April 4, 1942, Calmar Steamship Corporation received the following letter dated April 3, 1942 from United States Maritime Commission, War Shipping Administration:

"April 3, 1942.
"S. S. Portmar
"Dear Mr. Warley:

"On February 23rd we received advices through the Navy to the effect your SS Portmar was damaged in an air raid February 19th, 1942 at Port Darwin. We were advised the extent of the damage to the ship and further details with respect to the crew unknown.

"On April 1st we received through Navy channels a despatch from the Naval Observer, Melbourne, reading as follows:

" 'Darwin advises Portmar aground amidships to stern perforated port side by shrapnel. Does not believe can be salvaged as cargo carrier but might be as hulk or floating store.'

"Very truly yours,
"(Signed) J. C. Outler
"J. C. Outler
"Chief, Ship Control Section
"War Shipping Administration"

(101) On April 7, 1942, Calmar Steamship Corporation instructed Mather & Co., Philadelphia, to tender abandonment of its interest in S.S. Portmar to the war risk

underwriters, and on April 8, 1942, abandonment of its interest in S.S. Portmar was tendered to the underwriters through Thomas Stephens & Sons, Ltd., London. The underwriters rejected the tender of abandonment but agreed that libelant would be in the same position as though a writ had been issued on that day.

(102) On April 8, 1942, the condition and situation of the vessel, save that the initial step of pumping her out had been accomplished, remained as it was after her beaching, except that she had some temporary patches in the holes in her sides. She was still afloat at Darwin, but kept so only by operation of the pumps. The vessel's owner could not have arranged to retrieve and restore her to pre-disaster condition. The military situation in Australia was that the Japanese forces had driven as far east as to include all of the Dutch East Indies and an invasion of the northern part of Australia was threatened. The United States Army Transport Service was in desperate need of every vessel afloat or which could be made to float. No regard was paid to the charter commitments or commercial considerations affecting any available vessel.

(103) After the engagement of the Coral Sea—May 4-9, 1942—the United States Army decided to tow the Portmar to Brisbane and arrangements were made through Capt. Williams to accomplish that towage. There was no possibility of obtaining any naval escort in waters dominated by the Japanese west of the Torres Strait. The personnel of the tug were carefully picked; they were undertaking a very hazardous voyage.

(104) The towage of the Portmar from Darwin to Brisbane began on or about June 25, 1942 and ended at Brisbane on or about July 29, 1942. Two tugs were employed and a riding crew was on board the Portmar. The tow made a long detour around Melville Island and through the Gulf of Carpentaria, following the shore line, running only by night and hiding in coves by day. They were passing through waters completely dominated by the Japanese until they rounded Cape York and got down off Queensland Coast.

(105) The reasonable out-of-pocket cost of the services and equipment furnished to the Portmar and to the Australian Commonwealth Salvage Board in raising and towing her from Port Darwin to Brisbane was $55,130.; the cost to a private commercial interest would have been more and the reasonable value of the services much greater. The services, facilities and equipment furnished were not available at the time to any but the military and government agencies and to those working under the direction and on behalf of such agencies.

(106) When the Portmar arrived at Brisbane on July 27, 1942, her master left Melbourne to meet her and arrived at Brisbane on July 29, 1942. He had a pass signed by Col. Plant of the Army Transport Service. When he sought permission to go on board the vessel and presented the pass, a sentry barred him from admission. The Portmar was and continued to be under the exclusive control of the United States Army.

(107) The Master then applied to Col. Grimm in charge of the United States Army Transport Service at Brisbane for leave to go on board the Portmar. Col. Grimm endorsed the master's pass but Capt. Michelson was again barred from the vessel. He had to get a letter from Capt. Williams in order to get on board.

(108) At Brisbane, the master of the Portmar employed Capt. R. Douglas Taylor, a Brisbane representative of the American Bureau of Shipping, the British Corporation and Norwegian Veritas, and his engineer assistant, Lieutenant-Commander A. G. Horn of the Australian Navy, to survey the damage sustained by the Portmar. Thereafter, the Master of the Portmar received a preliminary report of survey signed by Lt. Commander Horn and later a complete survey report signed by R. Douglas Taylor and A. G. Horn dated September 19, 1942. In the latter survey report the surveyors estimated the cost of repairing the Portmar in such manner as would regain for her her former Classification, at approximately £120,000 Australian. That sum, at R/Ex.3.25 was equivalent to $390,000. Such repairs could then have been performed in Australia only by military or government agencies and under their direction and control.

(109) On or about August 19, 1942, the Commonwealth of Australia through the Crown Solicitor, made demand for £100,000 Australian as an award for salvage services rendered to the Portmar.

(110) Thereafter a salvage claim of £50,000 Australian was made by United Salvage Proprietary Ltd. and John Protheroe Willaims, for salvage services rendered in raising and floating the Portmar.

(111) Temporary repairs were undertaken and performed by a military detail of the United States Quartermaster Corps under the command of Major Haggett, utilizing scrap materials available in a local shipyard and from the wreck of a Liberty ship in Brisbane Harbor.

(112) The temporary repairs made by United States Army labor at Brisbane consisted in cleaning up the vessel, patching up the holes in the sides and superstructure, renewing booms and rigging, refurnishing after quarters, repairing leaks in the double bottom tanks. Holes in the hull were repaired by welding patches over the holes. The work was a patch-up job. The work done at Brisbane was not intended to and did not restore the vessel to commercial operating condition in class; under Major Haggett's orders only the minimum work was done, such as to permit the vessel to be operated in Australian waters during the war.

(113) On November 17, 1942, at twelve noon Eastern Australian time, the United States, acting by and through the War Shipping Administration, requisitioned title to S.S. Portmar at Brisbane, Queensland, Australia.

(114) The Portmar arrived at Sydney November 22, 1942 and was there placed on drydock for examination below the water line. Some additional repairs were there made.

(115) While the Portmar was on dry dock at Sydney, and thereafter, a further survey of the Portmar was made at which the owner, the war risk underwriters and the United States were represented. After all the patchwork repairs had been completed, the surveyors issued a joint report, dated Sydney, February 15, 1943, in which it was stated that the cost of all damage repairs necessary to restore the Portmar to the condition she was in prior to being bombed in the Timor Sea and at Darwin in February, 1942, would amount to approximately £28,000 Australian.

(116) The estimate contained in the Sydney Survey Report dated February 15, 1943, did not adequately measure the extent of the damage sustained by the Portmar in said enemy attacks. The estimate was made after considerable repair work had been done on her. All but one of the surveyors who signed the report never saw the Portmar until she arrived at Sydney, after a large amount of repair and reconditioning at Brisbane. The Sydney estimate was not an actual figure on which tenders for repairs were to be sought from shipyards, nor were specifications for such work ever prepared. All of the repairs required by the Army authorities for military purposes had already been done.

(117) After completion of the patchwork repairs at Brisbane and Sydney, the Portmar made two or three trips for the United States Army and then was torpedoed and sunk.

(118) The sound value of the Portmar for all purposes of these proceedings, so far as material, was $688,000.

(119) Libelant incurred and paid expenses in maintaining the Master of the Portmar including lodging, meals and transportation charges, also fees of surveyors, fees and disbursements of the Melbourne solicitors and other miscellaneous expenses and disbursements in and about the Defense, Safeguard and Recovery of the vessel, and the underwriters' interest in it.

(120) The salvage claims of the Commonwealth of Australia for £100,000 Australian and of United Salvage Proprietary Ltd. and John Protheroe Williams for £50,000 Australian were litigated in the High Court of Australia and were defended by Calmar Steamship Corporation under agreements with the war risk underwriters herein and with the United States, that the defense of said actions was to be without prejudice to any of said parties.

(121) The suit of the Commonwealth of Australia was dismissed. The suit of Unit-

ed Salvage Proprietary Ltd. and Williams resulted in a salvage award of £5,000 Australian with costs of £1156.9.9. Australian, equivalent at R/ex. 3.25 to a total of $20,008.59. This judgment with costs was paid and satisfied by libelant on February 9, 1944.

(122) On January 8, 1943 the war risk underwriters herein caused Thomas Stephens & Sons Ltd. to inform libelant through Mather & Co., Philadelphia, that they finally declined any liability in connection with libelant's loss with respect to the Portmar, by a letter as follows:

"Cl.

"Posted 8/1/43 8th January, 43.

"Messrs. Mather & Company,

"Philadelphia

"Dear Sirs:

"Calmar S/S Corporation
"S/S Portmar
"Hull—War Risk Insurance

"Referring to previous correspondence.

"Underwriters inform us that they have given further very careful consideration to this case and have taken legal opinion on the facts, and they now ask us to state their conclusions as follows.

"The facts disclose that after arrival in Australia the vessel discharged her outward cargo and thereafter operated under the orders of the military authorities.

"It was in the course of these operations, on a series of local voyages to & from Port Darwin that she became a casualty. These voyages were not even performed as a result of the Owners' decision and quite clearly represented an entirely fresh series of adventures which can by no stretch of imagination be considered as having anything whatever to do with the venture originally insured or with the extension of the insurance to cover the diversion of the vessel to Australia.

"Whether it be held that Underwriters' liability terminated on arrival of the vessel in Australia or when she discharged her outward cargo or when she was ordered into service by the military authorities seems immaterial for, whichever it be, they are definitely persuaded that all liability under their policies had terminated prior to the casualty. They therefore ask us to make it clear that they must, with regret, finally decline any liability in connection with this loss.

"Speaking for ourselves, we have the greatest sympathy for your friends in the situation in which they are placed but it does seem to us that, on the facts, they should be able to establish the liability of the W. S. A. &/or the Australian Authorities and we earnestly hope that they may succeed in obtaining recognition of this liability without further delay.

"Yours truly,
"Thos. Stephens & Sons, Ltd.,
"Director.

"(Here follow the initials of R. J. Merrett, the leading underwriter and the initials of all the other underwriters.)"

(123) Charter hire at the rate specified in Article 1.02 of said Charter for the period beginning February 19, 1942 and ending at noon November 17, 1942, Eastern Australian time, inclusive, amounted to $360,026.71. The expenses saved by the owner of the Portmar during said period amounted to $92,220. Charter hire in full was paid the owner of the S.S. Portmar pursuant to a charter party up to the time of the Japanese attack upon her February 19, 1942; no payment was made by the United States under Article 1.02 of the charter for three staff sergeants on board the Portmar as supercargoes, who were victualled from November 28, 1941 to February 19, 1942.

(124) At all material times after February 19, 1942, the Portmar's owner considered her to be a constructive total loss, made no attempt to continue to operate her pursuant to her charter to the United States and considered the charter party as terminated and at an end.

These findings of fact having been made, I turn to a consideration of the

## Conclusions of Law.

(1) This court has jurisdiction of the libel filed in Admiralty No. 133–332.

(2) This court has jurisdiction under Sections 1 and 2 of the Suits in Admiralty Act, 46 U.S.C.A. §§ 741, 742 of the libel filed in Admiralty No. 129–295, over all claims arising out of the charter.

The Portmar was operated "for the United States."

 The Portmar was not owned by the United States; the charter provided that the vessel should be operated by the owner and not the charterer. It was a time or voyage charter and not an actual demise of the vessel. United States v. Shea, 1894, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403; The Steel Inventor, 1940, D.C., 35 F.Supp. 986.

The arguments now advanced by the Government are opposed to the position taken by it in Matson Navigation Co. v. United States, 1932, 284 U.S. 352, 356, 359, 52 S.Ct. 162, 164, 76 L.Ed. 336. There it was urged that the time charter was a contract for the operation of a vessel "for the United States"; here, the contrary is urged. This is sought to be justified because of "certain peculiarities of World War I charters which expressly provided that the vessel's thereby chartered to the Government were to be operated 'for the United States' and granted the Government such extensive control over the details of their operation and management as to make them in effect actually demise or bareboat charters of the vessel * * *."

It is true that in the Matson charter it was recited that the ship was to be operated "for the Government". The omission of the words "for the Government" in the instant charter effected no change in the status of the vessel different from that under the Matson charter. The Portmar was operated on the voyage in the Government service; it was operated "for the United States" by the terms of the charter even though the label was lacking.

The charter provided for the total and exclusive use of the vessel's carrying capacity; by its terms "the owner agrees to let and the charterer agrees to hire the vessel * * *" (Art. 1.01); the compensation to be paid is stipulated at $4.70 per ton of the vessel's deadweight capacity"; this, to cover not only the use of the ship, but in full the "service [to be] rendered and expense incurred in its operation and maintenance, all of which undertakings are characteristically within the admiralty jurisdic-

tion." Matson Navigation Co. v. United States, supra, 284 U.S. at page 358, 52 S.Ct. at page 165.

The Portmar was employed as a merchant vessel.

She was chartered "for trading for one round voyage" (Art. 1.01); she was privately owned and operated for the profit of the owner, in charge of a master and crew, selected and employed by the owner and responsible to it alone. That the cargo was public stores and munitions did not render "public" the character of the vessel. She was owned neither absolutely nor *pro hac vice* by the United States. Public service did not alter the merchant character of the vessel nor impart to her, when operating under the voyage or time charter, sovereign immunity.

 (3) The plain purport and intendment of the insurance provisions of the charter between libelant and respondent United States of America was that libelant and its underwriters should assume all risks insured pursuant to such provisions and that respondent United States should not be liable under the charter for insured losses.

 (4) The agreement of underwriter respondents to hold the Portmar covered for diversion to Australia modified the terms of the policies in suit and operated only to extend the coverage and war risk insurance to port or ports in Australia, whilst there, and return to United States Pacific or Atlantic ports via Panama Canal.

The policies in suit were written for a round voyage. The cable of the underwriters changed and modified the coverage only to the extent of changing the port of destination on the outward voyage "to Australia" instead of "to the Philippines." Full premium had been paid and accepted for war risk cover on a round voyage. The words "to Australia" may not be torn from their context, O'Brien v. Miller, 1897, 168 U.S. 287, 297, 18 S.Ct. 140, 42 L.Ed. 469, and the return voyage remained covered as provided for in the policies.

(5) Any departures of the Portmar from the voyage described in the policies in suit were made for the safety of the vessel or

under compulsion of sovereign military authorities, and were involuntary on the part of the libelant and the master. No deviation or change of voyage occurred or operated to terminate the policies or to relieve the underwriter respondents from liability.

The underwriters urge that there were deviations on the voyage of the Portmar from the voyage contemplated at the time the insurance was executed. That changes in the voyage were made is not disputed; that if these were voluntarily made, the policies in suit would have been voided, is not challenged. I have found that the changes in the voyage were of an involuntary nature, that they were made under military compulsion, from the necessity of existing conditions or for the safety of the vessel. It has long been settled and accepted that, "Nothing is more clear than the general principle that a deviation never puts an end to the insurance, unless it be the voluntary act of those who have the management of the ship. Here the state of the case excludes the idea of the deviation (as the going to Falmouth has been called) having been voluntary. The ship was carried there by force, and without any consent of those who had the management of the ship. Deviation occasioned by force, and deviation occasioned by necessity are the same; for necessity is by force. It is no matter whether it be the want of repair, or any other immediate danger, which renders the deviation necessary. When the deviation is necessary and unavoidable it has no effect on the obligation of the insurer. * * *" Scott v. Thompson, 1805, 1 Bos. & Pul. (N.R. 181) 185; 127 E.R. 429, 431. See also, Aktiebolaget M. Bank v. American M. M. Ins. Co. (The Ada), 1925, 241 N.Y. 197, 149 N.E. 830; English Marine Insurance Act, 1906, Secs. 45(1), 46(1), 49(b), (d) and (e).

(6) All movements of the Portmar, including her arrival in Port Darwin on February 12, 1942, after stopping and discharging her outward cargo at Wyndham, were part of the outward voyage of the Portmar and under the coverage and within the war risk insurance of the policies in suit.

(7) The insured voyage was never voluntarily abandoned or terminated by libelant, the Portmar or her master.

The dunnage was discharged from the Portmar on the orders of the United States Army. The route of the vessel had been controlled from the time of departure on the outward voyage. There is no evidence to support the underwriters' contention that the homeward voyage was ever voluntarily abandoned. It was only because of the intervention of a sovereign that the return voyage was not commenced. See, North British & Mercantile Ins. Co. v. H. Baars & Co., 5 Cir., 1919, 255 F. 625.

(8) The Portmar was not intentionally exposed by libelant, her master, or crew to war risks or enemy attack, or to peril or risk of damage or loss.

The Master acted in obedience to orders of his sovereign conveyed to him by officers of the United States Army. He obeyed without requiring the exertion of force to coerce him; it was his duty and obligation to do this, not only as a citizen of the United States, but as master of a vessel flying his country's flag.

As Lord Wright wrote in Rickards v. Forestal L. T. & R. Co., 1942 A.C. 50, at page 80, "In one sense it was a moral compulsion, but in another sense it was more because it may be assumed that he was aware that, if he disobeyed the order, his government had means of vindicating its authority if not at the moment, at least subsequently. * * *"

To constitute a restraint of princes, or a requisition or detainment, it is not essential that there should be the presence of force as distinguished from an order backed by the sanction of force. The immediate presence of sufficient military force to enforce the sovereign's orders was not lacking, however, on February 12, 1942, when the Portmar was seized and requisitioned. It was the act of paramount power which prevented the homeward voyage and sent the Portmar on to Timor.

(9) The Portmar was restrained and detained, and her use seized and requisitioned without condemnation or transfer of owner-

ship by the sovereign governments of the United States of America and the Commonwealth of Australia on February 12, 1942.

(10) The "Free of British and Allied Capture Warranty" of the insurance policies in suit is not ambiguous, and expert testimony offered to explain, alter or vary its meaning has not been considered.

(11) The loss and damage sustained by the Portmar by reason of enemy attacks was not excluded from the coverage of the insurance issued by underwriter respondents in the "Free of British and Allied Capture Warranty" because it was within an exception to that warranty in the policies in suit.

The damages sustained by the Portmar were "consequences of hostilities or warlike operations" within the provisions of the F. C. & S. clause of the marine hull policies. The damages were the direct and immediate result of enemy attack, bombs and gunfire.

It has been found that there was a seizure and requisition of the use, and a restraint of the vessel at the times the damage was inflicted on the Portmar. It has also been found that the coverage of the policies had not terminated at the time of these acts of sovereign powers. The restraints under which the Portmar was operating were the proximate cause of the damage she sustained. Standard Oil Co. v. United States (The Llama), 1925, 267 U.S. 76, 78, 45 S.Ct. 211, 69 L.Ed. 519.

The question presented is whether loss and damage to the vessel sustained while such paramount forces were operating are excluded from coverage by the "Free of British Capture" rider of the war risk insurance policies in suit. Were the damages occasioned by the perils insured against? This must be determined by the language employed in the rider, read in the light of the other provisions of the policy.

The wording of the rider is clear: first, it frees the underwriters of "claims arising from Capture, Seizure, Arrest, Restraint, Detainment, Requisition, Nationalization or Condemnation by or under the authority of the government of Great Britain or any of its dominions, colonies, possessions or allies * * *." This exception, it seems, finds root in the fact that British underwriters were insuring against loss to a vessel flying the flag of the United States. Cf., Sanday & Co. v. British & Foreign Marine Ins. Co., 1915, 2 K.B. 781. The reason for this exception is said to be that "on the principles of English law, it is not competent to any subject to enter into a contract to do anything which may be detrimental to the interest of his own country." Arnould on Marine Insurance, 13th ed. Sec. 85. The paramount powers which acted were among those named in the warranty; no claim is, therefore, made against the underwriters for seizure, requisition, restraint or detainment.

The second clause of the rider then continues, " * * * but unless the insured Vessel is condemned this warranty shall not exclude losses otherwise covered by this policy which are caused by gunfire, torpedoes, bombs, mines, or other implements of war, or by stranding, sinking, burning or collision, provided such losses would not be covered by a marine insurance policy (in the form hereto attached) warranted free of claims arising from Capture, Seizure, or Detention."

The vessel was not condemned; there was no condemnation contemplated during the seizure, restraint, requisition or taking of the Portmar. The taking of the Portmar was not "by the enemy as prize, in time of open war, or by way of reprisals, with intent to deprive the owner of all dominion or right of property over the thing taken." Arnould, supra, Sec. 829; Andersen v. Marten, 1907, 2 K.B. 248, 253, 1908 A.C. 334.

The reason for the words "but unless the insured Vessel is condemned" is apparent when one considers that the change of title to a vessel condemned after capture dates back to the time of the taking, and damage to the vessel from enemy action in the interim would not be damage to the property of the assured. The very purpose of the second clause was to continue coverage to the assured while the vessel was under restraint or requisition

in the event that condemnation did not follow the taking of the vessel.

The losses for which libelant claims were covered by the terms of the war risk policies in suit without any reference to the rider. The rider served only to exclude certain risks arising from British capture, seizure, requisition, etc. This exclusion was, in turn, limited in scope by further exceptions, which, expressed in the second clause of the rider, render the provisions of the first clause inoperative as to the losses here claimed. The losses which were the "consequences of hostilities" remained covered under the provisions of the war risk clause because the interest of the assured in the vessel continued and was not terminated by the requisition, restraint and detainment. The damage to and loss of the vessel were excluded from the hull marine policy by the F. C. & S. clause because they occurred while "the taking of the vessel by requisition and restraint" was in effect and as "the consequences of hostilities or warlike operations."

The losses sustained by the Portmar were "otherwise covered" by the policies in suit. At the time of seizure and requisition, the round trip voyage had not been completed; the vessel had not returned to a port in the United States; she had not then lost her status as a private vessel. The conditions as they existed at the time of seizure and requisition are the tests to be applied in determining whether the vessel was "otherwise covered."

Neither counsel nor I have been able to find any decision or text consideration of the second clause of the rider, but the language is plain and the policies must be read and applied as they were written.

If there had been a capture, requisition or seizure by the enemy and consequent loss by warlike operation, coverage would be beyond dispute. This total and complete coverage against capture, seizure or requisition by Great Britain or her allies could not have been written; the underwriters insured to the full extent for which they might legally contract; not against such capture, seizure or requisition, but against war risk losses during such capture, seizure or requisition, when not followed by condemnation.

The rider contains no time or geographic limitations on coverage irrespective of what Great Britain or her allies might do with the vessel. Nor is there imposed any restriction on the nature of the operations in which the vessel might be employed. Under the wording of the rider, the insurance would continue during the seizure, and requisition throughout an entire conflict and on innumerable and perilous voyages or missions over the waters of the world. Indeed, that is broad coverage! Yet, it is what the underwriters elected to cover and to read the rider otherwise is to interpolate limitations they did not choose to write.

This second clause cannot be read, as the underwriters now wish it to be, so as to exclude losses, after British capture, arrest, etc., save those sustained while the vessel is "being detained for inspection" or while she is being brought into a control port for condemnation. It might well have been so drafted; the simple fact appears that it was not.

The policies in suit were written and procured to cover the risks and perils of war. One of the foreseeable incidents of war is that a sovereign may seize, requisition and take a vessel. War risk insurance is written to indemnify against just such losses; premiums are paid for such coverage. The bartered protection provided for by the policies is not to be taken away by judicial action because it is claimed that the underwriters did not intend to write a coverage as broad as the language they used granted.

 (12) The loss and damage to the Portmar in suit resulted from a peril of the voyage insured and no additional premium is payable to underwriter respondents pursuant to the "held covered" clause of the policies.

The "held covered" clause becomes operative only when there is a voluntary deviation or change of voyage, made by those in charge of the vessel. "In my opinion, it entitles the shipowner, as soon as he discovers that the warranty has been broken,

to require the underwriters to hold him covered. It also entitles the underwriters to exact a new premium commensurate with the added risk." Greenock S. S. Co. v. Maritime Ins. Co., Ltd., 1903, 1 K.B. 364, 367. Here, the "change of voyage was act and part of the * * * seizure." Rickards v. Forestal L. T. & R. Co., supra, at page 83. The "held covered" clause does not apply and no additional premium is due.

(13) All loss and damage sustained by the Portmar was within the coverage of the war risk insurance issued by the underwriter respondents to the libelant.

(14) The Portmar became a constructive total loss within the meaning of the policies by reason of the perils insured against by underwriter respondents.

The policies contain the following clause: "No recovery for a Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the Vessel shall exceed the insured value."

The American rule is that "if, after the damage is or might be repaired, the ship is not, or would not be worth, at the place of repairs, double the cost of the repairs, it is to be treated as a technical total loss." Bradlie & Gibbons v. Maryland Ins. Co., 1838, 12 Pet. 378, 9 L.Ed. 1123, 37 U.S. 378, 399. The English rule is that the loss is held constructively total when the cost of repairs exceeds the value of the vessel after the repairs. The policies in suit adopt the English rule.

The right of an assured to recover for a constructive total loss in the event of a disaster has been long recognized both in England, Rickards v. Forestal L. T. & R. Co., supra, and in the United States, Mason v. Marine Ins. Co., 6 Cir., 1901, 110 F. 452. This right is preserved to the assured.

So, too, the assured has been long given the privilege to claim a constructive total loss if there is high probability that the cost of recovering and repairing the vessel will exceed her full value when repaired (English rule), or half her value when repaired (American rule).

I do not read the "constructive total loss" clause as a waiver and surrender of the as-sured's right of abandonment for constructive total loss under the high probability rule. Such interpretation would oblige the assured to wait for completion of repairs, or spend the money itself to repair the vessel and thus determine, in fact, the actual total cost of repairs before a claim. In Klein v. Globe & Rutgers Fire Ins. Co., (The Tornado), 1924 A.M.C. 452, affirmed 3 Cir., 1924, 2 F.2d 137, 141, where a claim for constructive total loss was denied because the probabilities did not justify it, a clause identical with those in the instant policies was before the court, and concerning it the following was written by the district judge and quoted with approval by the Circuit Court: "It goes without saying that the insured is not required to raise and repair the vessel, to determine whether or not the cost would amount to more than the amount that would constitute it a constructive total loss; and, on the other hand, he is not entitled, without investigation and without due foundation of fact or extreme probability of fact, to place the entire burden upon the insurer by an abandonment. He must determine for himself whether he has the right to abandon. If he is able to show that the cost of restoring the vessel, 'so far as any reasonable calculations can be made,' would exceed the amount which would constitute it a constructive total loss, he is safe in abandoning it; but it must be remembered the existence of the fact that it would so exceed the amount, constituting a constructive total loss, is the criterion of his right to abandon."

The clause contemplates the application of the high probability rule in determining whether a constructive total loss has occurred.

Abandonment of the insured vessel must be tendered by the assured to the underwriters, if the assured elects to have a partial loss treated as a "constructive total loss."

Concerning abandonment, Chancellor Kent wrote, in 3 Kent Commentaries, as follows (p. 321): "The right of abandonment does not depend upon the certainty, but upon the high probability of a total loss, either of the property, or voyage, or both. The insured is to act, not upon cer-

tainties, but upon probabilities; and if the facts present a case of extreme hazard, and of probable expense, exceeding half the value of the ship, the insured may abandon, though it should happen that she was afterwards recovered at a less expense." See also, Peele v. Merchants Ins. Co., 1822, Fed.Cas.No. 10,905, 3 Mason 27; Bradlie v. Maryland Ins. Co., supra, 12 Pet. 378, 37 U.S. at page 398, 9 L.Ed. 1223; Royal Exchange Assurance v. Graham & Morton Co., 7 Cir., 1908, 166 F. 32.

 Abandonment of the Portmar was tendered the underwriters on April 8, 1942; by agreement between libelant and the underwriters, that date is to be taken as the date of the commencement of this suit. The right to abandon for constructive total loss depends then upon the facts existing on April 8, 1942, and it is as to this date that the "high probabilities" must be determined. I have made factual findings that the Portmar was a constructive total loss on February 19, 1942, after her beaching, and that she was a constructive total loss on April 8, 1942 after she was afloat in Darwin Harbor, when abandonment was tendered the underwriters.

The language of Erle, C. J., in Adams v. Mackenzie, 1863, 13 C.B.,N.S., 446, and quoted with approval by the Earl of Halisbury, L. C., in Sailing Ship "Blairmore" Company v. Macredie, 1898, A.C. 593, 598, is appropriate: "It has been urged on the part of the underwriters that they only intended to become answerable for one of two descriptions of 'total loss,' namely, the actual total destruction of the subject-matter of insurance, and not for that which all persons conversant with insurance business understand as being a total loss. All I can say is, if they so intended they have failed to express their intention."

(15) Libelant's tender of abandonment on April 8, 1942 to underwriter respondent was justified and valid under the terms of the war risk insurance policies in suit.

It has been urged by the underwriters that the "attempted abandonment" was a nullity under the Shipping Act of 1916, Sec. 9, 46 U.S.C.A. § 808, and Sec. 37, 46 U.S.C.A. § 835, because it was an attempt to pass title without the consent and approval of the United State Maritime Commission, to the underwriters all of whom were and are British subjects or British corporations.

It may well be that such approval was not required under the circumstances; however, it is not necessary to so decide now. The negotiations between libelant and the underwriters never reached the point where a transfer of title was made. The tender or offer of abandonment by libelant was rejected. At the time of rejection, the right and authority of the libelant to transfer title in the event of acceptance was not questioned; it was not made in whole or in part the basis of the rejection. If the underwriters had evidenced a willingness to accept a tender of abandonment, the consent of the United States Maritime Commission might have been obtained, whether or not it was necessary. Its absence does not affect the underwriters' liability.

(16) Libelant duly performed each and every term and condition of the war risk insurance policies in suit on its part to be performed.

(17) Libelant is entitled to recover from the underwriters the sum of $860,000, the insured value of the Portmar stated in the war risk insurance policies in suit, with interest from April 8, 1942.

(18) Certain monies were expended by libelant as a result of the damage and loss to the Portmar which constituted "sue and labor" charges within the provisions of the war risk insurance policies in suit. Libelant is entitled to recover the amounts so expended from the underwriter respondents, in addition to the insured value of the vessel above stated.

(19) The sum of $20,008.59 in satisfaction of the judgment for salvage award with costs in the High Court of Australia was paid by libelant for the account of underwriter respondents, and is recoverable from the underwriters with interest from February 9, 1944, in addition to the insured value of the vessel and the "sue and labor" charges.

(20) The Portmar did not sustain any loss or damage from any cause which

would render respondent United States of America liable therefor under the charter.

(21) The Portmar became a constructive total loss on February 19, 1942 within the meaning of her charter to respondent United States of America.

(22) United States of America is not liable to libelant for charter hire in addition to the amounts already paid.

(23) Libelant duly performed all the terms and conditions of the charter to be performed on its part.

(24) Libelant is entitled to a decree against underwriter respondents for $860,-000 with interest on this amount from April 8, 1942, and for $20,008.59 with interest on this amount from February 9, 1944; and for an amount of "sue and labor" expenses with interest, as determined by a Commissioner to be appointed by the court, with costs.

(25) The libelant is entitled to recover from the United States of America, respondent, the sum of $238.50 with interest from February 11, 1944, the date on which the libel was filed, and is, accordingly, entitled to a decree against this respondent therefor.